# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE

February 25, 2025 Session

## STATE OF TENNESSEE v. HARLAN V. FERGUSON, ALIAS HARLEY T. MARTIN

**Appeal from the Criminal Court for Knox County**
No. 108894   Bobby R. McGee, Judge[1]

_____

**No. E2019-02224-CCA-R3-CD**

_____

A Knox County jury convicted Defendant, Harlan V. Ferguson, alias Harley T. Martin, of two counts of vehicular homicide, evading arrest, reckless endangerment with a deadly weapon, driving under the influence ("DUI"), DUI per se, and failure to drive within a single lane of traffic. The trial court merged the vehicular homicide and DUI convictions into one vehicular homicide conviction and imposed an effective ten-year sentence with one year to be served in confinement followed by probation. While Defendant's direct appeal was pending in this court, he filed a petition for writ of error coram nobis, in which he alleged that newly discovered evidence may have resulted in a different judgment. The trial court denied the petition, and this court consolidated Defendant's direct appeal of his convictions and his appeal from the denial of coram nobis relief. On appeal, Defendant challenges (1) the trial court's denial of his motion to suppress his statements to law enforcement; (2) the State's failure to establish the chain of custody of Defendant's blood samples; (3) the trial court's denial of his motion to dismiss due to the destruction of evidence; (4) the trial court's admission of lay testimony regarding the cause of the victim's injuries; (5) the trial court's admission of Defendant's medical records; (6) the trial court's exclusion of defense evidence; (7) the trial court's failure to issue a missing witness instruction; (8) the State's comments during closing arguments; (9) the State's failure to disclose evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (10) the trial court's denial of Defendant's petition for writ of error coram nobis. Defendant also argues that the cumulative effect of the errors entitles him to relief. Upon review, we affirm the judgments of the trial court.

---

[1] Judge McGee presided over the trial, sentencing hearing, and hearing on Defendant's motion for new trial. Judge McGee subsequently retired, and Judge Ryan M. Spitzer presided over Defendant's coram nobis proceedings by interchange.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed.**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., and W. MARK WARD, SP. J., joined.

Eric Lutton, District Public Defender; Jonathan Harwell (on appeal and at coram nobis hearing), Halle Hammond (on appeal), Christy Murray (at trial and coram nobis hearing), and Kathryn Fraser and Carter Pack (at trial), Assistant District Public Defenders, for the appellant, Harlan V. Ferguson, alias Harley T. Martin.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Heather Good, Joe Welker, and Greg Eshbaugh, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Facts and Procedural History

During the evening hours of February 3, 2016, officers with the Knox County Sheriff's Office ("KCSO") attempted to stop a 2012 Kia Soul that was traveling at a high rate of speed.  Before officers could catch up to the vehicle, it ran off the road and struck a tree.  The occupants of the vehicle were Defendant and the victim, Sarah Howe, both of whom sustained multiple injuries from the crash.  The victim died from her injuries.  On August 30, 2016, Defendant was charged by presentment with vehicular homicide, vehicular homicide by intoxication, evading arrest, reckless endangerment with a deadly weapon, DUI per se, DUI of an "intoxicant," DUI of marijuana, DUI of an "intoxicant" and marijuana, and the failure to drive within a single lane of traffic.

### A.  Trial

Defendant's trial commenced in September 2019.  During opening statements, the State asserted that Defendant was driving under the influence and in a reckless manner, resulting in the crash and the victim's death.  Defense counsel argued that Defendant was not the driver and that the victim was not "fleeing from the police" but "was fleeing from a perceived threat . . . that was generated by two officers who conducted a dangerous pursuit on a dark, country road in unmarked vehicles."  Defense counsel also contended that the subsequent investigation by law enforcement was inadequate.

Benjamin Sumner, Defendant's former employer, testified that after he and Defendant worked on February 3, 2016, they went to Mr. Sumner's home to repair Defendant's Jeep but determined that they needed to order a part. They then decided to "hang out" and drink alcohol. They began drinking between 4:30 and 5:30 p.m., and Defendant was drinking Jack Daniel's whiskey "out of a bottle with a chaser." The victim arrived between 5:30 and 6:00 p.m. in her green 2012 Kia Soul. They continued to drink, and Mr. Sumner said that he and Defendant drank whiskey and that the victim had "[m]aybe a couple of swigs" of whiskey. At approximately 6:30 p.m., Mr. Sumner smelled marijuana outside of his house near his driveway, but he did not see Defendant smoking marijuana.

Mr. Sumner testified that Defendant and the victim left in the victim's Kia at approximately 7:00 p.m. Mr. Sumner initially testified that Defendant was driving and that the victim was sitting in the passenger's seat. However, on cross-examination, Mr. Sumner acknowledged that he based his testimony that Defendant was driving on a news article or other information that Mr. Sumner received following the crash. Mr. Sumner agreed that he was in the bathroom when Defendant and the victim left, that he had no personal knowledge of who drove the vehicle, and that after using the bathroom, he walked outside and saw the taillights of the vehicle as Defendant and the victim were leaving.

On February 4, 2016, at approximately 5:30 a.m., Defendant called Mr. Sumner and stated that he and the victim had sustained extensive injuries from an accident and that the victim had died. Mr. Sumner testified that when he visited Defendant at the hospital later that evening, Defendant stated that he "ran from the police" and "gave them hell" and that Defendant "thought it was funny." Mr. Sumner stated that although Defendant did not specifically say that he was driving the vehicle, Defendant's statements "surely impl[y] to me that [Defendant] was driving." Mr. Sumner acknowledged that Defendant provided conflicting statements regarding the crash and did not appear to be "in a straight state of mind." Mr. Sumner stated that he spoke to Defendant following his release from the hospital and that Defendant expressed remorse and guilt. Defendant told Mr. Sumner, "I really screwed up. I don't know why I did it, how it happened[.] . . . I made a mistake and I've got to live with this the rest of my life."

Danny Hickey, who lived in the area where the crash occurred, testified that while he was on his neighbor's front porch, he saw a vehicle go by "really fast," followed by a white sports utility vehicle ("SUV") and a black Ford F-150 truck, both of which had flashing blue lights underneath the vehicles. Mr. Hickey said that he did not hear the crash but saw a vehicle on fire and heard people yelling for help. He ran toward the crash site, where he observed that the vehicle had run off the road, "jumped" a driveway, struck a mailbox, and continued through a field until it struck a tree. The SUV and the truck, both

of which were unmarked police vehicles, were parked in the road, and the blue emergency lights under both vehicles were flashing.

Mr. Hickey stated that he reached the wrecked vehicle at the same time as two officers who were wearing suits and ties. Mr. Hickey determined that the men were officers within "[j]ust a few seconds." He testified that the vehicle was on fire and that Defendant, who he identified as the driver, was attempting to exit the vehicle on the driver's side. The lower half of Defendant's body was inside the vehicle, and Defendant was attempting to crawl out of the vehicle. Mr. Hickey did not see Defendant struggling with an airbag. Mr. Hickey and one of the officers picked up Defendant and moved him away from the vehicle.

Mr. Hickey testified that he walked around to the other side of the vehicle, where he saw the victim lying on the ground next to the passenger's side door. The victim's eyes were closed, and she was not making any noise. Mr. Hickey stated that the passenger's side door was shut and that the window was rolled up. He never saw the passenger's side door open while at the scene. Mr. Hickey stated that Chief David Henderson was the only officer to whom he spoke at the scene regarding his observations and that law enforcement officers never came to his home to obtain a statement from him.

KCSO Chief David Henderson testified that in February 2016, he was head of the task force in the narcotics unit and assisted in traffic control when needed. He had a police-issued, white Chevrolet Tahoe, which was unmarked and had multiple blue lights. On February 3, 2016, at approximately 7:25 p.m., Chief Henderson was driving home and speaking to Captain David Amburn on their cell phones regarding police pursuit of a suspect in the area on an unrelated case when an SUV passed Chief Henderson's SUV traveling eastbound on Emory Road at a high rate of speed and in an area of the roadway with a double yellow line. Chief Henderson stated that the vehicle was green and that he believed it to be a Kia Soul, but he also acknowledged that he initially was unable to identify the make and model of the vehicle. As the Kia passed him, he turned on his blue lights, hoping that the Kia would slow down. When the Kia failed to do so, Chief Henderson turned off his blue lights and "continued on to the house" in the same direction in which the Kia was traveling.

Chief Henderson suggested to Captain Amburn that he go toward the area where the Kia was traveling. Chief Henderson and Captain Amburn continued conversing on their cell phones while Chief Henderson followed the Kia from a distance. Chief Henderson explained that they communicated over their cell phones rather than over the radio because the channel was "cleared" for those officers who were involved in the pursuit of the other suspect in the area. Chief Henderson saw Captain Amburn's truck with its blue lights activated at the intersection of Brown Gap Road, Emory Road, and

- 4 -

Crippen Road, and Chief Henderson also reactivated the blue lights on his SUV. Captain Amburn told Chief Henderson, "Oh, crap, he almost hit me and ran in the ditch and went around me." The Kia continued down Brown Gap Road.

Chief Henderson testified that Captain Amburn had positioned his truck in such a way that Chief Henderson could not drive around it. Captain Amburn turned his truck around in a driveway while Chief Henderson waited, and Captain Amburn, followed by Chief Henderson, drove down the path that they believed the Kia was traveling. Chief Henderson stated that the blue lights were activated on his SUV and Captain Amburn's truck, that KCSO policy requires officers to activate the blue lights on their vehicles when engaged in a pursuit, and that he did not decide to engage in a pursuit of the Kia until the Kia reached Brown Gap Road. Captain Amburn notified the dispatcher of the way the Kia was being driven. Other traffic was in the area during the pursuit, and Chief Henderson testified that although he was initially pursuing the Kia due to a traffic violation, "when he put the public in danger, that takes it up a notch." Chief Henderson noted that the driver of the Kia was evading police, which is a felony, and Chief Henderson was concerned for the safety of the officers who were investigating an unrelated incident in the area. Chief Henderson acknowledged that according to KCSO policy, an officer may not engage in a high-speed pursuit in an unmarked police vehicle unless the suspect is involved in a serious felony and presents an "immediate and direct threat" to life or property. Chief Henderson did not consider terminating the pursuit, and he "suppose[d]" it was his responsibility to determine whether the pursuit should be discontinued. Once Chief Henderson began following Captain Amburn, he did not see the Kia again until after it had struck a tree.

The Kia was on fire, and its front was damaged. Chief Henderson and Captain Amburn approached the driver's side of the Kia, where the driver, who Chief Henderson identified as Defendant, was struggling with the airbags and attempting to exit the Kia. Chief Henderson "assumed" Defendant was the driver since he was attempting to exit the driver's side of the Kia. A neighbor also assisted them with the Kia's occupants. Defendant's right leg was "mangled," and Chief Henderson smelled alcohol when helping to remove Defendant from the Kia. Chief Henderson also assisted with moving the victim, who was found lying outside of the Kia. Both Defendant and the victim were transported to a hospital.

Chief Henderson stated that he was the highest-ranking officer at the scene but that Officer Steve Lane was placed in charge of the scene and the investigation once Officer Lane arrived. Chief Henderson did not recall providing a formal statement or completing any reports related to the crash. Chief Henderson and Captain Amburn discussed whether their following the Kia could be classified as a "pursuit" given that they did not catch up

to the Kia until after it had struck a tree. Captain Amburn completed a post-pursuit report "just to err on caution."

Chief Henderson testified that the Kia was transported to an impound lot and that he released the Kia to an insurance company five days after the crash. He explained that the victim's father requested that the Kia be released due to an outstanding debt on the Kia. After consulting with an attorney, Chief Henderson released the Kia to the insurance company, and the Kia was subsequently sold to an automobile parts and salvage business. Chief Henderson did not consult with a prosecutor or the lead investigator prior to releasing the Kia. He acknowledged that vehicles may be stored by law enforcement for an extended period. He did not ensure that photographs were taken of the Kia during the daytime before releasing it and did not consult anyone to determine whether the Kia had been examined for mechanical failure. He denied releasing the Kia to hide or destroy evidence.

Captain Amburn, a twenty-eight-year veteran of the KCSO and a lieutenant in February 2016, testified that on the evening of February 3, 2016, numerous patrol units were pursuing a suspect who had fled to a wooded area near the area where the crash later occurred. Captain Amburn headed to the area in a police-issued, unmarked Ford F-150 truck to assist. The truck had emergency lights on the right side, in the grill, in the taillights, under the tailgate, in the cab, and on the back of the cab.

Captain Amburn testified that Chief Henderson called him on his cell phone and that while they were talking, a vehicle passed Chief Henderson at a high rate of speed. Chief Henderson told Captain Amburn that a vehicle passed him and a group of other vehicles at a high rate of speed on a road with a double yellow line. Captain Amburn proceeded to the area where the vehicle was headed while continuing to talk to Chief Henderson. Captain Amburn reached the intersection of Emory Road, Crippen Road, and Brown Gap Road and saw a vehicle, which he later identified as a Kia, approaching the intersection from Emory Road at a high rate of speed. Captain Amburn activated all the blue lights on his unmarked truck and pulled into the middle of the intersection. He observed Chief Henderson's SUV with its blue lights activated behind the vehicle. Captain Amburn testified that the Kia "centered up" over the double yellow line in the road while continuing to proceed at a high rate of speed. Captain Amburn told Chief Henderson, "Oh, crap, I think he's going to ram me." Captain Amburn stated that "[a]t the last second," the Kia "turned hard left" and went "partially in the ditch" and around his truck. The Kia sounded to Captain Amburn as if it "bottomed out" in the ditch, but Captain Amburn did not look in the ditch to see if the Kia lost any parts. The Kia then continued eastbound on Brown Gap Road toward Bell Road at a high rate of speed.

Captain Amburn testified that Chief Henderson was unable to drive his large SUV around Captain Amburn's truck. Captain Amburn backed up in a driveway while Chief Henderson waited, and Captain Amburn, followed by Chief Henderson, proceeded down Brown Gap Road toward Bell Road. Captain Amburn lost sight of the Kia but believed the Kia was headed toward an area where officers were searching for a suspect in an unrelated case. He announced over the radio that a vehicle was fleeing toward the area where the officers were located. Once Captain Amburn reached Bell Road, he believed he saw the "unusual taillights" of the Kia at the end of a straightaway, and he continued following that direction.

When Captain Amburn approached the intersection of Bell Road and Emory Road, he saw the Kia and another car stopped at a stop sign. The Kia was on the wrong side of the road next to the other car, and the Kia and the other car were facing the same direction. The driver of the Kia attempted to cross the intersection through oncoming traffic. Captain Amburn stated that before he reached the intersection, the Kia "pushed its way through" traffic and "shot to the left and then immediately straight across Bell Road." By the time Captain Amburn crossed the intersection, the Kia had traveled around a bend in the road, and due to the number of curves in the road, Captain Amburn was unable to maintain sight of the Kia. Captain Amburn drove over a hill and saw a Jeep partially off the road and in the grass and the taillights of the Kia up ahead. He stated that based on his experience, the Jeep appeared to have been forced off the road. Captain Amburn was not able to get close enough to the Kia to determine the number of occupants or the tag number.

Captain Amburn continued following the same path as the Kia. He saw what appeared to be dust in the air as he was driving toward a bend in the road. While driving around the bend, his headlights illuminated a field where he saw pieces of a mailbox and other debris on the ground and a set of tire marks through a muddy field leading to the Kia, which had struck a group of trees. Captain Amburn testified that when a vehicle brakes or loses traction, the wheels "get[] out of track," resulting in "four sets of [tire] marks or some derivative to it" but that the Kia left two tire tracks in the field leading to the trees that were "perfect" and "straight." Captain Amburn noted that the Kia had rotated almost ninety degrees upon striking the trees and was smoking.

Captain Amburn testified that he and Chief Henderson approached the driver's side where the driver, who Captain Amburn identified as Defendant, was trying to exit the Kia on that side. Captain Amburn and Chief Henderson yelled for Defendant to put his hands up because they did not know whether he was armed. Defendant was struggling with the front and side airbags as he attempted to exit the Kia. Captain Amburn testified that the crash was so severe that portions of the interior on the driver's side were pushed inward. The firewall was crushed, the steering column had rotated upward, and the pedals and "everything else" underneath the driver's feet had been forced upward. Defendant's feet

- 7 -

were wedged under a portion of the driver's side interior that had been crushed. Captain Amburn stated that Defendant sustained leg injuries that were consistent with the portions of the Kia's interior on the driver's side being forced down on his legs on impact.

Captain Amburn stated that he looked inside the Kia and saw that the passenger door was open and the front passenger seat was tilted back. While Mr. Hickey and Chief Henderson assisted Defendant, Captain Amburn ran around the Kia and found the victim lying next to the rear tire on the passenger's side. The victim was conscious, and she was lying on her back with her feet toward the rear bumper. Captain Amburn asked the victim where she was injured, and the victim moaned and put her hand on her stomach. Captain Amburn testified that he observed "a red line across her stomach and up toward her chest that looked consistent with a seat belt." He stated that based on the numerous car accident investigations in which he had been involved during his twenty-eight years in law enforcement, the red mark on the victim was "consistent with a seat belt and the danger there is I've seen people die from spleen injuries and everything." He noted that the red mark was on the victim's right side, which was the same side in which a seat belt wraps across a front passenger. He also noted that the passenger seat was reclined, which could explain why the red mark was higher on the victim's body. Captain Amburn acknowledged that he did not see the victim's injuries at the hospital or during the autopsy and that he did not review her medical records or autopsy photographs.

Once the fire in the Kia began to intensify, Mr. Hicks and Chief Henderson moved Defendant, who sustained severe leg injuries, away from the Kia, and they then assisted Captain Amburn in moving the victim. The victim was subsequently transported via helicopter to a hospital. Captain Amburn also saw car seats in the back seat of the Kia and attempted to open the back doors to ensure that no one else was inside. He noted that the rear bumper was ripped off the Kia because of the crash and that after the Kia was fully engulfed in flames, only the rear quarter panels and the hatchback area remained.

According to the post-pursuit form completed by Captain Amburn, the pursuit ended at 7:35 p.m., which he stated was likely the time that he called for an ambulance. At 4:30 or 5:00 a.m., Captain Amburn went to the hospital to obtain blood samples from Defendant pursuit to a search warrant ("the legal draw"). Captain Amburn stated that he and an evidence technician, Trina Gregory, entered Defendant's room where Defendant was sitting up in his bed. When Captain Amburn and Officer Gregory reached the door sill, Defendant looked up at Captain Amburn and immediately said, "I've screwed up." Officer Gregory was wearing a uniform, and Captain Amburn had his badge and a gun and was wearing a law enforcement-issued shirt. Captain Amburn stated that as a result, "it was quite evident who we were." He informed Defendant that he had a search warrant to obtain a blood sample. Captain Amburn asked two relatives in the room with Defendant to step outside.

Captain Amburn described Defendant as "very talkative." Defendant said he had "really screwed up," and Captain Amburn responded that he believed Defendant had made bad choices but that they "were going to work through this." Defendant told Captain Amburn that he would like to apologize to the two officers from whom he had fled, and Captain Amburn stated that Defendant did not owe them an apology but that he probably owed the victim's family an apology. Defendant asked Captain Amburn whether the victim had passed away, and Captain Amburn confirmed that she had. Defendant told Captain Amburn that the victim was his girlfriend, that they had planned to marry, and that the victim had children. Defendant talked about his relationship with the victim and about how "he was really messed up" and said that "he didn't really sober up enough until around 1:30 in the morning to figure out what had happened" and that "he knew he was going to jail for what he did." Captain Amburn testified that Defendant never said the victim was driving and that Defendant stated that he had "insisted" on driving.[2]

Captain Amburn testified that he did not "say very much to [Defendant], did not ask him hardly anything at all." Captain Amburn stated that he "pretty much just nodded and listened to what he had to say." Defendant told him that "[y]ou and I both know I shouldn't have been driving." When Captain Amburn explained the process of obtaining his blood sample and what would be done with the sample, Defendant stated that they "won't find any drugs, just alcohol." Captain Amburn stated that Defendant's statements implied that Defendant was the driver.

Captain Amburn testified that Defendant was "very lucid" and did not appear to have any issues understanding what was occurring. Captain Amburn was unaware of the medication that had been administered to Defendant until Officer Gregory requested a list of his medications for the purposes of testing his blood. Captain Amburn learned that Defendant had been administered fentanyl, Versed, and propofol at the hospital. Captain Amburn did not advise Defendant of his *Miranda* rights and did not record Defendant's statements or make contemporaneous notes about the statements. Captain Amburn later summarized Defendant's statements in a memorandum. When Defendant made the statements to Captain Amburn, Defendant was not under arrest or otherwise restrained and was not told that he would be arrested. Officers were not stationed outside Defendant's hospital room, and Captain Amburn did not speak to hospital security. Captain Amburn did not know when Defendant was formally charged with the offenses.

---

[2] Captain Amburn testified that Defendant told him that the victim "had begged him not to drive, but that he insisted." Defense counsel objected, and the trial court sustained the objection as to what the victim had stated.

Captain Amburn stated that it was decided that because so much time had passed between the crash and the blood draw from Defendant pursuant to the search warrant, the results of testing would not accurately reflect Defendant's alcohol or drug levels at the time of the crash. Captain Amburn procured a search warrant to obtain Defendant's blood samples drawn by hospital personnel as part of the hospital's normal admittance procedures ("the medical draw"). Captain Amburn and an evidence technician executed the search warrant at the hospital laboratory. An employee with the laboratory provided Defendant's blood samples, and the evidence technician took possession of them. Captain Amburn did not know the identity of hospital personnel who drew Defendant's blood from the medical draw, the tests that hospital personnel ran using the blood, where the blood was stored in the hospital, or who had handled the blood before hospital personnel gave the samples to law enforcement.

Captain Amburn testified that although he completed a post-pursuit form, he questioned whether he and Chief Henderson engaged in a pursuit "due to the fact of how far he got away from us and how little we saw him." Captain Amburn stated that "it was not your typical pursuit, being within five car lengths behind somebody." He did not consider terminating the pursuit, and he stated that he would have done so had he believed it was too dangerous to continue. He said that crime scene officers were tasked with securing any evidence at the scene and that the supervisor of the unit that investigated the crash was responsible for deciding whether to complete an accident reconstruction. Captain Amburn recalled discussing what occurred with another officer at the scene.

Dr. Christopher Lochmuller, the Chief Deputy Medical Examiner for Knox and Anderson Counties and an expert in forensic pathology, performed the victim's autopsy and testified that the victim's death was the result of multiple blunt force injuries. The victim's spleen, liver, and small intestine were torn, her colon was damaged, and three ribs on her right side and two ribs on her left side were broken.

Dr. Lochmuller received information that the victim had been involved in a single-vehicle accident and that while the vehicle was being pursued by law enforcement, the vehicle ran off the roadway, rolled, and struck a tree. Dr. Lochmuller testified that the information that he received regarding the circumstances of the crash changed over time, explaining that he was told that the victim "was ejected, then they said that she wasn't ejected, that she was the driver, wasn't the driver." He stated that an investigator with the medical examiner's office obtained information from various sources that the victim was believed to be the driver of the vehicle. However, other information obtained by the investigator and other medical records listed the victim as a passenger who had been "restrained."

The victim had bruising on the right side of her neck and jaw line, under her chin, and on both sides of her chest. She had two small abrasions on her back and an abrasion on her abdomen that was eight inches long and one-half inch wide. The abrasion was predominantly on the right side of her abdomen and came "just above her belly button, a little bit to the left." Dr. Lochmuller testified that he could not conclude definitively that the abrasion was caused by a seat belt and that he could not reach a conclusion on whether the victim was a passenger or the driver based on the anatomic findings. He noted that the victim's medical records from the emergency room reflected that hospital personnel indicated on a sketch what they believed to be a mark caused by a seat belt on the victim's body. However, Dr. Lochmuller explained that the long abrasion on the right side of the victim's abdomen was higher than he expected it would be had it been caused by a seat belt and that the victim's injuries on her face, jawline, and neck were unusual locations for a seat belt to leave a mark. He stated that had the victim's seat been leaned back, the seat belt could have left a mark that high on the victim's body, but he could not "say that's what it is."

The State, without objection by the defense, showed Dr. Lochmuller one page of Defendant's medical records, which Dr. Lochmuller identified as stating, "BAC 135, EtOH positive." Dr. Lochmuller explained that "EtOH" stands for ethanol alcohol, which is contained in beer, wine, and liquor. This one page was entered as an exhibit at trial without objection by the defense. In response to questioning by the defense, Dr. Lochmuller testified that fentanyl is a synthetic pain killer that is "very potent," that propofol is a sedative used to render a patient unconscious, and that Versed is a "fast-acting" benzodiazepine or sedative.

KCSO Detective Steve Lane, who was a patrol officer with the traffic division in February 2016, testified that he was called to the scene. By the time he arrived, both Defendant and the victim had been transported to the hospital, and other officers had photographed and otherwise preserved the scene. Detective Lane noted that there were several officers at the scene, each of whom had a different task. He stated that a lead investigator was not called to the scene and that the senior ranking officer at the scene was in charge. Detective Lane spoke to Captain Amburn, Chief Henderson, and a witness at the scene, but he did not record his interactions with them or otherwise take formal statements from them. Detective Lane completed a report and a diagram of the scene, which was entered into evidence. He explained that an accident reconstruction was not completed because KCSO policy did not provide for an accident reconstruction in single-vehicle accidents when no fatalities occurred at the time of the crash. Detective Lane did not inspect the Kia at the scene and did not collect any evidence from the Kia. He was aware that vehicles have a "black box" that stores information, but he did not have the black box removed from the Kia. He was unaware of whether any photographs were taken of the Kia during the daytime.

On cross-examination, Detective Lane testified that he did not know whether car keys were found at the scene or on Defendant or the victim. He identified a patient property list that was part of Defendant's medical records, and he acknowledged that the list did not include any keys as being found on Defendant. Defendant requested that the page from Defendant's medical records be admitted into evidence, and the trial court granted the State's request to admit Defendant's entire medical records under "the rule of completeness." Detective Lane identified a patient property list that was part of the victim's medical records, which noted that "keys" were found on the victim.

KCSO Officer Sandy Campbell with the forensic unit testified that she was assigned to photograph the scene of the crash. She noted that the Kia had struck a mailbox before striking a tree, that the Kia's rear bumper was located near the tree line, and that most of the debris that had broken off the Kia had fallen "forward" and was located on the other side of the tree line. Officer Campbell stated that although the Kia was no longer on fire by the time that she arrived at the scene, the Kia was still very hot and was smoking. As a result, it was "uncomfortable" to approach the Kia until more time had passed, and she was unable to inspect the Kia's airbags and doors due to the heat. She photographed the Kia while it was dark outside, and she did not take any photographs of the Kia during the daytime. She did not have a mechanic examine the Kia for a mechanical failure, explaining that such tasks were not within the purview of the forensic unit.

According to Knox County Emergency Communication, a pipe with residue was recovered from Defendant at the hospital. Officer Campbell went to the hospital and retrieved a "purple pinch hitter" that contained "some green leafy substance" from a member of the hospital's security team. Officer Campbell explained that a "pinch hitter" is a pipe that is traditionally used to smoke marijuana.

KCSO Detective Preston Huddleston testified that on February 3, 2016, he was dispatched to the emergency room to seek Defendant's consent to obtain his blood. Detective Huddleston arrived around midnight on February 4 and spoke to Defendant, who "was alert, not really saying much but he was aware of his situation." Detective Huddleston asked Defendant to consent to a blood draw, but Defendant refused to consent and refused to sign the implied consent form.

KCSO Officer Deidra Bules with the forensic unit testified that on February 4, 2016, she accompanied Captain Amburn to the hospital laboratory to collect four vials of Defendant's blood from the medical draw pursuant to a search warrant. Officer Bules believed the vials were labeled and sealed. At 5:33 p.m., Officer Bules received the vials from a technician at the hospital's laboratory. She transported the vials from the medical draw to the KCSO forensic laboratory, stored them in a refrigerator in a secure area, and

documented the items on a property receipt. She noted that the refrigerator was located behind a door that required a thumb print and a key card to access and that removal of any evidence from the refrigerator was required to be documented. According to the property receipt, the vials from the medical draw were removed from the refrigerator on February 19, 2016, at 8:10 a.m. and transported to the Tennessee Bureau of Investigation ("TBI"). According to the TBI request form, the vials from the medical draw were transported to the TBI by Tom Finch, KCSO's fingerprint expert who also makes "all the TBI runs."

On cross-examination, Officer Bules testified that she did not know who drew Defendant's blood at the hospital during the medical draw or whether hospital personnel tested the blood samples, added anything to the blood samples, properly stored the blood samples, or followed proper procedures in handling the blood samples. She did not know how long it took to transport the vials from the hospital to the KCSO forensic laboratory. She acknowledged that she could not vouch for the integrity of the blood samples from the medical draw.

Special Agent Michael Tiller, a forensic scientist in the toxicology department at the TBI's regional crime laboratory in Knoxville and an expert in the field of toxicology, testified that he conducted toxicology testing on Defendant's blood samples from the medical draw. The results showed the presence of an inactive metabolite of marijuana. Special Agent Tiller stated that the results indicated that Defendant had used marijuana within twenty-four to forty-eight hours of the blood draw. Special Agent Tiller acknowledged that an inactive metabolite alone will not result in impairment, that he could not determine whether the metabolite was from hemp or marijuana, and that at the time of the blood testing, the TBI did not have the ability to test for active THC.

According to the TBI's internal chain of custody documents, the TBI received the four tubes of Defendant's blood from Tom Finch on February 19, 2016, at 10:45 a.m. Documents indicated that the tubes had hospital labels with the name "Harlen Ferguson" and February 3, 2016, at 20:38, indicating when the blood was drawn. Special Agent Tiller testified that once samples are brought to the TBI laboratory, they are checked in by an evidence technician, assigned a unique laboratory number and stored in a refrigerator inside a vault until they are tested. The samples were first tested for alcohol by Special Agent Jonathan Thompson, and Special Agent Tiller then conducted a toxicology analysis.

Special Agent Tiller testified that in addition to Defendant's blood samples from the medical draw, the TBI also received Defendant's blood samples from the legal draw, which were contained in tubes supplied by the TBI. He stated that compounds are pre-added to the tubes supplied by the TBI to officers in blood draw kits to help preserve the blood and prevent it from coagulating. Special Agent Tiller said blood that has clotted

into "a solid blob" can be difficult to extract from the tube and that such clotting can affect the test results. He noted "rare instances" where bacteria are introduced in the blood sample, and he explained that bacteria could feed on glucose and produce alcohol and that the TBI tubes contain a compound that prevents such bacterial growth. Although he acknowledged that "something could be introduced" into a blood sample whenever the top of a tube is removed, "you would need also the right conditions for things to grow, so again not being refrigerated, kept in hot places[,] and not stored properly." He stated that while refrigerating blood samples was "ideal," the samples would be "okay" if they were at room temperature "for a little while" with no preservatives in them but that "[y]ou wouldn't want them at like super high temperatures."

Special Agent Tiller tested blood samples in two of the four tubes from the medical draw. He stated that a DNA test was not performed on the samples and that the samples were "presumed" to be Defendant's blood because his name was on the tubes and the form submitted by the officer to the TBI. Special Agent Tiller stated that the tubes were likely not vacuum sealed when the TBI received them because the hospital would have tested some of Defendant's blood from the samples for the purpose of diagnosis and treatment. To Special Agent Tiller's knowledge, the samples from the medical draw did not contain any compounds or preservatives. He did not note any issues with clotting or bacterial growth in the blood samples from the medical draw in the case file or his report, and he testified that he would have noted such issues had he observed them.

Special Agent Tiller testified that all the whole blood from the medical draw was used in alcohol and toxicology testing by the TBI. He stated that most laboratories likely would have been unable to test the small amount of serum or plasma that may have remained from the sample. He acknowledged that the defense may have been able to obtain independent testing of the sample if they located a laboratory that could test the small amount of remaining serum or plasma.

Special Agent Tiller testified that he did not test Defendant's blood samples from the legal draw. When asked whether he had a scientific basis for failing to do so, he explained that TBI analysts generally test blood samples collected closer to the time in which the incident occurred. He stated that because the legal draw occurred several hours after the crash, the blood samples from the legal draw "would not have as [much] relevant data associated with them" as the blood samples from the medical draw. Special Agent Tiller acknowledged that the test results of Defendant's blood samples from the legal draw could have shown any medication given to him at the hospital. The alcohol/toxicology request form for Defendant's blood samples from the legal draw stated that tests for fentanyl, propofol, and Versed should be excluded. Special Agent Tiller testified that fentanyl and propofol are narcotic analgesics and that propofol can be used for anesthesia and can cause "sedation or stupor" in large doses. He stated that Versed is a central

nervous system depressant that hospital personnel can use to calm a patient or to help in intubating a patient and that a larger dose of Versed can cause memory loss or render the patient "in a state of stupor or extreme impairment." He also stated that a combination of Versed, propofol, and fentanyl in amounts within the therapeutic range could calm a patient and relieve a patient's pain and that a combination of the medication in high doses could sedate the patient. Special Agent Tiller identified a page from Defendant's medical records from February 4, 2016, at 3:47 a.m., which stated that Defendant was "[a]lert and oriented. In obvious pain. Able to answer questions appropriately."

Special Agent Jonathan Thompson, a forensic scientist at the TBI's regional crime laboratory in Knoxville and an expert in the field of toxicology, testified that he conducted alcohol testing on Defendant's blood samples from the medical draw. He stated that the results of testing showed .180 grams percent of ethyl alcohol in Defendant's blood. The blood sample was tested twice for alcohol, and the final reported result reflected the average amount obtained from the two tests.

Special Agent Thompson tested Defendant's blood sample from the medical draw that was collected on February 3, 2016, rather than Defendant's blood sample from the legal draw that was collected on February 4. Special Agent Thompson explained that because alcohol metabolizes in a person's body over time, it is generally preferred to test a person's blood sample drawn closer to the incident to obtain a more accurate representation of the person's alcohol level at the time of the incident. He stated that there was a "good possibility" that the alcohol from Defendant's blood sample from the legal draw taken approximately nine hours after the crash would have metabolized. He acknowledged that someone with the TBI directed him not to test the blood sample from the legal draw, but he stated that the determination of which sample to test is within the forensic scientist's discretion. He explained, "Usually we test the earlier sample because like I said[,] it is a better representation of what occurred during the incident."

Special Agent Thompson did not know who accessed Defendant's blood samples from the medical draw at the hospital or the conditions in which the samples were stored at the hospital. He tested one tube of Defendant's blood from the medical draw and stated that to his knowledge, the tube did not contain any preservatives. He assumed that the tube had been opened previously and that some of the blood had been used for testing at the hospital. He acknowledged that any ethyl alcohol that had been converted to gas could have escaped when the tube was opened. He also acknowledged that microbials could enter the tube when opened and that the microbials could feed on the glucose in the blood and produce alcohol. He stated that because the TBI received and tested the samples so quickly, "it's unlikely that fermentation could occur and it was not in the appropriate conditions meaning it needed sufficient amount of heat and a sufficient amount of microorganisms and enough [of a] food source in the blood sample to actually produce

enough ethanol." Special Agent Thompson did not test for the presence of bacteria or fungi in the samples and did not determine whether the sample had fermented. To ensure that the testing instrument did not produce a result that was based on contamination of the blood samples at the hospital, he ran a series of certified standards at the beginning of the alcohol analysis and at every tenth position, and he testified that "all of [his] standards met in the acceptable criteria." He also conducted negative testing based on those standards and did not observe anything "abnormal" in the blood sample.

Finally, in addition to presenting Defendant's entire medical records as an exhibit, the State introduced individual pages from the medical records as exhibits. One hospital record provided, "Patient admits to EtOH tonight. Patient states he was running from the police and had an accident. Patient states air bags did deploy. Patient states he was not wearing his seat belt. Patient was drug out of vehicle by rescue." Hospital records noted that Defendant had abrasions to his face and chest, and the discharge summary stated that Defendant sustained an injury to his right knee and fractures and other injuries to his pelvis and right leg. A note in the records from February 4, 2016, at 4:37 a.m. stated, "The patient was alert and oriented, in obvious pain, able to answer questions appropriately." A case management note entered on February 8, 2016, regarding a meeting with Defendant stated that "patient was [the] driver in [a] motor vehicle crash in which his fiancée with whom he lived was killed." On this evidence, the State rested its case in chief.

The defense presented the testimony of Margaret Massengill, a forensic technician with the TBI's toxicology division at the crime laboratory in Knoxville. Ms. Massengill testified that in February 2016, she spoke to an assistant district attorney regarding Defendant's blood samples from the medical draw and the legal draw and that "we did agree to only test the samples" from the medical draw. Ms. Massengill stated that "[t]here never came a need" to test the samples from the legal draw "based on the conversation that I had." She noted that the samples selected for testing were those taken closer in time to the incident and that the samples from the legal draw would have been tested if the samples from medical draw did not include an adequate volume of blood for testing.

On September 1, 2016, Ms. Massengill destroyed Defendant's blood samples from the legal draw and the remaining samples from the medical draw. She stated that the policy of the TBI laboratory in Knoxville is to destroy blood samples after approximately six months. She explained that the laboratory receives 400 to 700 blood samples each month and that the destruction policy is due to "a storage issue." She stated that the district attorney could have requested that the blood samples be preserved for a longer period but did not do so. She did not receive a request from the defense to preserve the samples or have them tested by another laboratory before their destruction. More than one year after

the samples were destroyed, a member of the defense team contacted her regarding the availability of the samples.

The jury convicted Defendant of vehicular homicide, vehicular homicide by intoxication, evading arrest, reckless endangerment with a deadly weapon, DUI per se, DUI of an "intoxicant," and the failure to drive within a single lane of traffic. The jury acquitted Defendant of the charges of DUI of marijuana and DUI of an intoxicant and marijuana. During a sentencing hearing on November 7, 2019, the trial court merged the two vehicular homicide convictions and merged the DUI convictions into each other and into the vehicular homicide conviction. The trial court imposed an effective ten-year sentence, with one year to be served in confinement and the remainder on probation.

## B. Motion for New Trial Proceedings

Defendant filed a timely motion for new trial in which he raised twenty-one issues. Defendant alleged that the State improperly failed to disclose information regarding an internal affairs investigation that concluded on August 20, 2019, and that resulted in Captain Amburn's receiving a verbal reprimand for his failure to disclose his knowledge of an incident of police misconduct, which occurred in April 2019, and led to two other officers being demoted and suspended for two days without pay. Defendant asserted that defense counsel made repeated inquiries into Captain Amburn's personnel file and that defense counsel only learned of the investigation through local media coverage on September 6, 2019, the same day that the jury returned its verdict against Defendant. Defendant attached to his motion for few trial two news articles published on September 6 and October 1, 2019, regarding the incident.

During the December 12, 2019 hearing on the motion for new trial, Defendant entered the written summary of the internal affairs interview of Captain Amburn as an exhibit. According to the summary, the incident involved an altercation between two officers, one of whom was trying to keep the other officer from driving a police-issued vehicle while intoxicated. At the time, Captain Amburn was the supervisor over the narcotics fleet vehicles, including the vehicle at issue. A KCSO employee contacted him to locate an extra key to allow someone else to drive the vehicle. Captain Amburn believed the employee called him again later and reported that an extra key had been located. He was aware that because of the altercation, one of the officers was injured and a citizen's vehicle was damaged. Captain Amburn explained that he did not report the incident because both he and the intoxicated officer had applied for a chief position, and Captain Amburn did not want to appear as if he was deliberately attempting to make the officer "look bad."

At the conclusion of the hearing, the trial court denied Defendant's motion for new trial, concluding that he was not entitled to relief on any of the issues raised. The court found that the incident involving Captain Amburn in 2019 was unrelated to the incident involving Defendant in 2016 and that "there's simply no materiality or probative value about what happened in 2019 as it might relate to what happened in 2016." The court entered an order denying Defendant's motion for new trial, and Defendant filed a timely notice of appeal.

### C. Coram Nobis Proceedings

On June 30, 2020, while the direct appeal was pending, Defendant filed a petition for writ of error coram nobis, alleging that newly discovered evidence may have resulted in a different judgment. Defendant asserted that on April 17, 2020, news reports emerged that Chief Henderson was under investigation by the Federal Bureau of Investigation ("FBI"), that FBI agents searched Chief Henderson's home pursuant to a search warrant on April 9, 2020, and that Chief Henderson retired from the KCSO shortly thereafter. Defendant further asserted that the news reports indicated that Chief Henderson was removed from his narcotics unit duties in January 2019 and was "effectively sidelined from police work altogether" in October 2019. Defendant attached two news articles as exhibits to the petition.

Defendant asserted that he sought information regarding Chief Henderson and Captain Amburn prior to trial through a discovery motion and public records requests. Defendant attached the public records requests and the prosecutor's email in response to the defense's request for information from the officers' files. Defendant also attached an affidavit from trial counsel, stating that at the time of trial, she was unaware that Chief Henderson was under federal investigation or that he had been subject to any internal discipline or reduction in responsibilities due to suspicion of wrongdoing.

Defendant argued in his petition and accompanying memorandum that evidence that Chief Henderson was under federal investigation "may have led to a different outcome" had such evidence been presented at trial. Defendant asserted that had evidence of the federal investigation against Chief Henderson been presented at trial, it would have been difficult for the jury to have accepted Chief Henderson's testimony, that "there is a strong possibility" that the jury would have believed the defense's challenges to the "professionalism, motivation, and honesty of the officers," and that such evidence "would have at least raised a reasonable doubt in the minds of one or more jurors." Defendant also asserted that evidence of the federal investigation should be considered along with evidence of Captain Amburn's reprimand for failing to report police misconduct.

The appellate record does not include a written response by the State to Defendant's petition. Defendant subsequently filed a motion in this court, requesting that this court

- 18 -

stay his direct appeal proceedings pending resolution of his coram nobis petition, and this court entered an order granting Defendant's motion.

On February 16, 2022, a federal grand jury returned an indictment charging Chief Henderson with conspiracy to commit federal program fraud. The indictment, a copy of which Defendant filed in the trial court, alleged that from 2011 until approximately 2018, Chief Henderson and other unindicted co-conspirators conspired to commit theft of federal program funds by using the cash fund and credit card from the KCSO narcotics unit to purchase items for the personal use of themselves and others and by directing subordinate officers to perform construction projects of a personal nature during official work hours.

On July 18, 2022, Defendant filed an "Additional Claim in Support of Petition for Writ of Error Coram Nobis," in which he alleged that additional newly discovered evidence may have affected the result of his trial had it been presented. Defendant alleged that in April 1997, Chief Henderson and other officers engaged in a high-speed pursuit of Jeremy Justice, during which the officers were in an unmarked vehicle, did not activate the blue lights or siren, and were dressed in plain clothes rather than uniforms. Mr. Justice subsequently was acquitted of charges of resisting arrest, evading arrest, and reckless driving that resulted from the high-speed pursuit. Mr. Justice sued Knox County due to injuries that he sustained during his arrest and received a settlement of $380,000. Defendant asserted that defense counsel was unaware of the information at the time of trial and first learned of the information in May 2022, when Mr. Justice's counsel reached out to defense counsel upon learning of Defendant's allegations in his coram nobis petition. The appellate record does not include a written response by the State.

During a June 9, 2023 hearing, the trial court dismissed Defendant's claim of coram nobis relief with respect to the 1997 incident, finding that Defendant was not reasonably diligent in seeking the evidence and that Defendant could have discovered the evidence through "some simple, well-directed questions in discovery." The court also found that the 1997 incident "is of very little relevance to the ultimate coram nobis issue." The court allowed Defendant to present evidence to support his claim for coram nobis relief based on the federal indictment against Chief Henderson. The parties stipulated that the factual allegations in the indictment were to be accepted as true for the purposes of the hearing.

During the hearing, Captain Amburn testified regarding the April 2019 incident that led to his receiving a verbal reprimand. He stated that he did not officially report the incident involving the altercation between two officers but said that when questioned during the investigation into the incident, he acknowledged knowing about the incident. He explained that at the time, he and one of the officers involved were vying for the same

promotion and that he did not want it to appear as if he was attempting to "smear" the officer's character.

Captain Amburn testified that he was "shocked at a lot of the allegations" against Chief Henderson in the federal indictment. Captain Amburn stated that he was never offered use of the narcotics funds to make personal purchases and that he did not engage in any construction projects while on duty. He was aware of some of the underlying conduct listed in the indictment, such as the purchase of Apple products using narcotics funds, which can be a valid use of the funds. However, he was unaware of any underlying illegal activity related to such conduct, such as the allegations that the Apple products purchased with narcotics funds were for personal use. He stated that had he been aware of any illegal activity, he would have reported it.

Captain Amburn testified that he was unaware that Chief Henderson was engaging in illegal activity or was under investigation at the time of Defendant's crash. Captain Amburn denied that he engaged in "untoward" behavior during the crash and resulting investigation or that Chief Henderson instructed him to do so. Captain Amburn maintained that he testified truthfully at trial. He stated that he was not the lead investigative officer of the crash but that he was "the primary person as far as where I was in position at the time of the accident." He recalled testifying at trial that he did not believe it was proper for him to be the lead investigative officer because he was a witness to the crash. Captain Amburn acknowledged preparing two search warrants, but he did not know whether Chief Henderson instructed him to do so or whether "I just inferred what I needed to do." Captain Amburn recalled that the decision to obtain a search warrant for Defendant's blood samples from the medical draw resulted from a consultation of KCSO's in-house legal counsel.

Detective Lane testified that he believed Chief Henderson, as the highest-ranking officer at the scene of Defendant's crash, was in charge while at the scene. Detective Lane stated that neither Chief Henderson nor Captain Amburn directed him on what steps to take in conducting his investigation. Detective Lane also stated that his portion of the investigation was complete once he filed his report. He assumed that the narcotics unit oversaw the investigation since members of the unit were at the scene.

Detective Lane testified that in February 2016, he was unaware of Chief Henderson's engaging in any conduct that resulted in the federal indictment. Detective Lane stated that at the time of trial, he did not know why Chief Henderson had been transferred to administrative duty. Detective Lane said he testified truthfully at trial.

At the conclusion of the hearing, the trial court made findings denying Defendant's petition for a writ of error coram nobis. The court found that the federal indictment against

- 20 -

Chief Henderson was "credible new evidence," that the parties stipulated to the allegations included in the indictment, and that the defense was without fault in failing to discover the evidence prior to trial. In examining whether the evidence may have affected the judgment, the court found Captain Amburn to be "particularly credible, both based on having looked at his trial testimony and listening to his testimony here today." The court categorized the newly discovered evidence as impeachment evidence and stated that even if the jury disregarded Chief Henderson's entire testimony based on this impeachment evidence, Captain Amburn was an "intervening, reliable witness," who testified regarding his observations of the Kia both before and after the crash and Defendant's conduct. The court also stated that the impeachment evidence did not "spill[ ] over on to [Captain] Amburn because [Captain] Amburn was fully credible today and was clear and adamant about having never been asked to do anything untoward in the investigation by Chief Henderson." The court concluded that in light of Captain Amburn's testimony at trial and the other evidence establishing Defendant's guilt, there was no reasonable basis to believe that "the outcome would have been different" had the newly discovered evidence been presented at trial.

On July 12, 2023, the court entered an order denying Defendant's petition for writ of error coram nobis in which the court repeated its findings from the evidentiary hearing. The court noted that it had misspoken during the hearing in stating that there was no reasonable basis to believe that the outcome "would have been different" and clarified that its finding was that there was no reasonable basis to believe that the outcome "may have been different" had the newly discovered evidence been presented at trial. Defendant filed a timely notice of appeal of the denial of his petition for writ of error coram nobis.

## II. Analysis

This court consolidated Defendant's direct appeal and his appeal of the denial of coram nobis relief. In this consolidated appeal, Defendant challenges (1) the trial court's denial of his motion to suppress his statements to law enforcement; (2) the State's failure to establish the chain of custody for Defendant's blood samples; (3) the trial court's denial of his motion to dismiss due to the destruction of evidence; (4) the trial court's admission of lay testimony regarding the cause of the victim's injuries; (5) the trial court's admission of Defendant's medical records; (6) the trial court's exclusion of defense evidence; (7) the trial court's failure to issue a missing witness instruction; (8) the State's comments during closing arguments; (9) the State's failure to disclose evidence; and (10) the trial court's denial of Defendant's petition for writ of error coram nobis. Defendant also argues that the cumulative effect of the errors entitles him to relief.

## A. Denial of Motion to Suppress Defendant's Statements

Defendant contends that the trial court erred in denying his motion to suppress his statements to Captain Amburn while at the hospital. He maintains that he made the statements during a custodial interrogation without being advised of his rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966). He also argues that the effect of injuries sustained in the crash and the medication administered to him at the hospital rendered his statements involuntary. Finally, he asserts that the erroneous admission of his statements was not harmless beyond a reasonable doubt. The State responds that Defendant was not in custody when he made the statements, that he did not make the statements in response to an interrogation by Captain Amburn, and that his statements were otherwise voluntary.

### 1. Suppression Hearing

Prior to trial, Defendant filed a motion to suppress his statements to Captain Amburn while at the hospital. Defendant asserted that he made the statements during an improper custodial interrogation and that Captain Amburn failed to advise him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant argued that his statements, therefore, were taken in violation of his right against self-incrimination under the federal and state constitutions. He also asserted that the effects of the medication administered to him at the hospital, "augmented by the injuries he suffered from the accident, overbore [his] will to make his statements involuntary," and, thus, his statements were taken in violation of his due process rights under the federal and state constitutions.

The trial court held a series of hearings prior to trial addressing Defendant's motion to suppress his statements, as well as other motions filed by Defendant. During the suppression hearing, Captain Amburn offered testimony regarding the circumstances leading to the crash that was generally consistent with his trial testimony. Defendant was transported by ambulance from the scene of the crash to the University of Tennessee Medical Center. During the early morning hours of February 4, 2016, Detective Huddleston requested Defendant's consent to obtain a sample of his blood. At 12:19 a.m., Defendant refused consent for a blood sample and refused to sign the implied consent form. Detective Huddleston noted that Defendant was not cooperative or talkative at that time.

At 5:00 or 5:30 a.m. on February 4, 2016, Captain Amburn and an evidence technician went to the hospital to obtain a blood sample from Defendant pursuant to a search warrant. Captain Amburn testified that when he arrived, no officers were stationed outside or inside Defendant's hospital room, and Defendant was not handcuffed. To Captain Amburn's knowledge, the KCSO had not requested that hospital security place a

"hold" on Defendant, and Captain Amburn did not have a warrant for Defendant's arrest. Captain Amburn acknowledged that he believed Defendant was the driver, that Defendant was listed as a "suspect" in the search warrant, and that, subject to the execution of the search warrant, nothing prevented Defendant from leaving the hospital other than his injuries.

Captain Amburn stated that Defendant's hospital room had sliding glass doors, one of which was open. Defendant was sitting up in his hospital bed, and two female relatives were in the room with him. Captain Amburn was dressed in plain clothes, and the evidence technician was wearing a "full uniform." Captain Amburn testified that as soon as he and the evidence technician came to the threshold of the door, Defendant said, "I really screwed up, didn't I?" Captain Amburn responded, "[Y]es, sir, I'm afraid you made some bad choices tonight. And, you know, we're just going to have to work through this." Although Captain Amburn believed Defendant knew he and the evidence technician were law enforcement officers, Captain Amburn introduced himself and the evidence technician and explained to Defendant that he had a search warrant to obtain a blood sample. Defendant stated that they would find alcohol but not drugs in his blood. Captain Amburn explained that he asked the two family members to wait outside to avoid making any statements in front of them that would embarrass Defendant. Captain Amburn testified that he did not record his conversation with Defendant because he had not intended on asking Defendant any incriminating questions and because Defendant was not in custody.

Captain Amburn testified that Defendant was "very polite and very talkative" and that he appeared as if he "wanted to get something off his chest." Defendant stated that he wanted to apologize to the two officers from whom he had fled. Captain Amburn said Defendant did not make the statement in response to an interrogation. As Defendant continued discussing the events, Captain Amburn asked Defendant why he was driving in such a manner, and Defendant responded that he "wanted to go home."

Captain Amburn stated that within four or five minutes of his arrival, Defendant asked him whether the victim was alive, and Captain Amburn informed him that he had just learned of the victim's death. Defendant discussed the victim with Captain Amburn and stated that he and the victim were planning to marry. Captain Amburn asked Defendant whether he and the victim had any children because he had observed car seats in the vehicle, and Defendant stated that the victim had children. Defendant told Captain Amburn that the victim had not wanted him to drive but that he had "insisted" and that he knew he was going to jail. At one point, Defendant said, "I really F'd up. I didn't realize what was going on [till] about 1:30. I didn't sober up [till] after 1:30 to figure out what was going on." Defendant also told Captain Amburn that "you and I both know I shouldn't have been driving that car."

- 23 -

Captain Amburn described Defendant as "very cooperative and very talkative." Captain Amburn stated that Defendant was otherwise "very calm and collected" and that Defendant "was very matter of fact, very apologetic and . . . almost seemed resolved that he already realized what was coming down the path and that he had accepted responsibility for it." Captain Amburn stated that Defendant became "a little choked up" when discussing the victim and became "agitated" when discussing his missing wallet. Captain Amburn told Defendant that he assumed officers took his wallet to check his identification for purposes of preparing the necessary reports. Captain Amburn assured Defendant that he would locate his wallet and return it to him, and Captain Amburn testified that he later located Defendant's wallet and returned it to him in his hospital room. Captain Amburn was aware that Defendant had "serious breakage to his lower extremities," and when Captain Amburn returned Defendant's wallet to him, Defendant stated that he had undergone multiple surgeries and would be hospitalized for a period.

Captain Amburn affirmed that Defendant did not appear "out of it," did not lapse in and out of consciousness, and did not appear to have any difficulty understanding his questions. Captain Amburn said the evidence technician asked about Defendant's medications and listed in the toxicology request form that Defendant had been given fentanyl, propofol, and Versed. Captain Amburn was not familiar with Versed but acknowledged that fentanyl and propofol were narcotics. He did not seek to determine when those medications had been administered to Defendant prior to speaking to him. Captain Amburn testified that Defendant "was very lucid in his conversation" and did not appear to be incapacitated because of any medication. Captain Amburn explained, "I didn't detect any of the things that, in my professional experience, would lead me to believe that he was heavily—heavily medicated. He had no slurred speech; he was articulate in what he was saying; he wasn't searching for his words." Captain Amburn acknowledged that Defendant would "wince" when he moved due to his injuries.

At the conclusion of the hearing, the trial court made oral findings and denied in part Defendant's motion to suppress his statements to Captain Amburn. The court found that Defendant "immediately engaged in conversation" with Captain Amburn, that "[a]t first[,] the officer wasn't asking him any questions," and that Defendant's statements "were spontaneous and not the result of any kind of interrogation." The court suppressed Defendant's statement that he had wanted to go home in response to Captain Amburn's question regarding why Defendant had been driving in such a manner. The court found that Captain Amburn had asked "a question that was under circumstances in which the officer had to know that the focus of the investigation was narrowing to [Defendant] and he should have Mirandized him before asking any questions and he did not do that."

- 24 -

## 2. Standard of Review

This court is bound by a trial court's findings of fact in a suppression hearing unless the evidence preponderates against such findings. *State v. McKinney*, 669 S.W.3d 753, 764 (Tenn. 2023); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. "The prevailing party 'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" *McKinney*, 669 S.W.3d at 764 (quoting *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010); *Odom*, 928 S.W.2d at 23). This court may consider the evidence presented both at the suppression hearing and at trial in evaluating the trial court's ruling on a pretrial motion to suppress. *McKinney*, 669 S.W.3d at 764; *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). This court reviews "a trial court's application of law to the facts under a de novo standard of review with no presumption of correctness." *McKinney*, 669 S.W.3d at 764 (citing *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)).

## 3. Failure to Advise Defendant of His Miranda Rights

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda*, 384 U.S. at 478. Prior to any questioning by law enforcement, the individual must be warned that

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* These rights may be knowingly and intelligently waived. *Id.* "But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Id.*

- 25 -

*Miranda* warnings are required only "when a suspect is (1) in custody and (2) subjected to questioning or its functional equivalent." *State v. Moran*, 621 S.W.3d 249, 257 (Tenn. Crim. App. 2020) (citing *State v. Walton*, 41 S.W.3d 75, 83 (Tenn. 2001)). "In the absence of either, *Miranda* requirements are not necessitated." *Id.* (citing *Walton*, 41 S.W.3d at 83). This court has recognized that "the defendant bears the initial burden of proving custody for the purposes of *Miranda* before the burden shifts to the State to prove voluntariness of the statement." *Id.* at 258.

A person is "in custody" within the meaning of *Miranda* if there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see State v. McCary*, 119 S.W.3d 226, 251 (Tenn. Crim. App. 2003). Our supreme court has recognized that "in determining whether an individual is 'in custody' and entitled to *Miranda* warnings, the relevant inquiry is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 852 (Tenn. 1996); *see State v. Lowe*, 552 S.W.3d 842, 867 (Tenn. 2018). This test is an objective assessment from the suspect's viewpoint, and "the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question." *Anderson*, 937 S.W.2d at 852. Factors relevant in making an objective assessment of whether a person was in custody at the time of questioning include:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* at 855. These factors are not exclusive, and the inquiry is "very fact specific." *Id.*

The State contends that the evidence failed to establish that Defendant was in custody when he made the statements to Captain Amburn. The State argues that "[s]imply because Defendant was confined to a hospital bed and unable to freely move about due to his injuries does not mean that he was in custody for the purposes of *Miranda*" and that

- 26 -

"a reasonable person in Defendant's position would not consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Defendant responds that the trial court "implicitly found" in ruling on the motion to suppress that he was in custody when he made the statements and that the trial court's ruling is supported by the evidence.

The trial court did not specifically address the issue of custody in ruling on Defendant's suppression motion. Our supreme court has recognized that when a trial court failed to set forth its findings of fact in ruling on a suppression motion, "we will decide on our own where the preponderance of the evidence lies." *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001) (citing *Fields v. State*, 40 S.W.3d 450, 457 n.5 (Tenn. 2001); *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997)); *see also State v. Freeland*, 451 S.W.3d 791, 816 (Tenn. 2014) (deciding "where the preponderance of the evidence lies" when the trial court failed to make specific findings of fact as to defendant's oral motion to suppress challenging the voluntariness of his confession); *State v. Meeks*, No. M2007-01600-CCA-R3-CD, 2008 WL 2152493, at *4 (Tenn. Crim. App. May 22, 2008) ("Because the trial court made no findings on the record concerning the custodial nature of the defendant's interview, we must determine where the preponderance of the evidence lies."). However, the trial court made findings that relate to some of the relevant factors in determining custody, such as the character of the questioning, the interactions between Captain Amburn and Defendant, and the extent to which Defendant was confronted with Captain Amburn's suspicions of guilt or evidence of guilt. *See Anderson*, 937 S.W.2d at 855. Furthermore, evidence of other relevant factors, such as the location where Defendant made the statements, his method of transportation to the location, the number of officers present, and the restraints imposed on Defendant, were presented primarily through the testimony of Captain Amburn, and the evidence related to these factors is largely undisputed. Thus, we conclude that the record is sufficient to allow us to address the issue of custody. *State v. Cooper*, 912 S.W.2d 756, 759 (Tenn. Crim. App. 1995) (addressing whether the defendant's statements were the result of custodial interrogation despite the trial court's failure to make findings of fact when the officer was the only witness who testified at the suppression hearing and "the evidence is not in dispute").

Courts from other jurisdictions have declined to find that a hospitalized defendant questioned by police officers was in custody for purposes of *Miranda* when the defendant's "restraints" at the hospital were due to medical treatment rather than police conduct and absent any other police conduct that would lead a reasonable person in the defendant's position to consider himself deprived of freedom of movement to a degree associated with a formal arrest. *See e.g.*, *United States v. Jamison*, 509 F.3d 623, 629 (4th Cir. 2007) (differentiating between "police-imposed restraint" and restrictions "incident to [the defendant's] background circumstances" and concluding that the hospitalized defendant was not in custody when the limitations on his freedom were the result of

medical treatment from his injuries); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985) (rejecting the hospitalized defendant's claim that he was in custody when questioned by police but the police were not involved in his hospitalization did nothing to extend the hospitalization); *State v. Thomas*, 843 So.2d 834, 839-40 (Ala. Crim. App. 2002) (holding that a hospitalized defendant who caused an accident that resulted in a fatality was not in custody for purposes of *Miranda* when the only restraint on his freedom of movement was due to his medical condition and treatment, he had been issued a citation for DUI but no hold had been placed on him, and he was not charged with homicide before or during his hospital stay); *People v. Milhollin*, 751 P.2d 43, 50 (Col. 1988) (noting that "confinement to a hospital bed is insufficient alone to constitute custody") (citation omitted); *State v. Garrison*, 323 A.3d 279, 289-96 (Conn. 2024) (concluding that the hospitalized defendant was not in custody for purposes of *Miranda* based on the totality of the circumstances); *People v. Vasquez*, 913 N.E.2d 60, 66 (Ill. App. 2009) (recognizing that "physical incapacity resulting from forces outside the control of law enforcement officials does not, in our view, amount to custody"); *Bowman v. Commonwealth*, 686 S.W.3d 230, 241 (Ky. 2024) (noting that "the restraint giving rise to 'custody' must be restraint instigated by the police, and for that reason the majority rule is that confinement to a hospital bed does not, by itself, amount to 'custody' for *Miranda* purposes") (citation omitted).

"This is not to say that an individual would never be 'in custody' when held for medical treatment in a hospital." *Martin*, 781 F.2d at 673. Rather, "[i]f the police took a criminal suspect to the hospital from the scene of a crime, monitored the patient's stay, stationed themselves outside the door, arranged an extended treatment schedule with the doctors, or some combination of these, law enforcement restraint amounting to custody could result." *Id.*; *see Mayberry v. State*, 600 S.E.2d 703, 705 (Ga. App. 2004) (concluding that a defendant who was questioned by police while at the hospital was in custody for purposes of *Miranda* when he was initially surrounded by police cars at the scene and the police handcuffed him to a gurney and accompanied him in the ambulance and later handcuffed him to the stretcher at the hospital and restrained his legs); *State v. Grant*, 939 A.2d 93, 101-03 (Me. 2008) (holding that a hospitalized defendant was in custody when officers tased him, forcibly removed him from his truck, handcuffed him, accompanied him to the hospital, maintained a constant presence outside his hospital room, interrogated him multiple times, made him aware that they would return when he refused to answer their questions, and made it clear that they were tracking his medical condition with hospital staff).

In the present case, Defendant was not arrested or handcuffed at the scene; he was transported to the hospital by ambulance; and the proof does not establish that an officer accompanied Defendant to the hospital. Detective Huddleston went to the hospital more than four hours after the crash and asked Defendant to submit a blood draw. Defendant

refused to consent, and Detective Huddleston promptly left. Approximately five hours later, Captain Amburn and an evidence technician went to the hospital to execute a search warrant for a blood draw from Defendant. The KCSO had not placed a hold on Defendant; no officers were stationed inside or outside of Defendant's hospital room; and Defendant was not handcuffed. Defendant's freedom of movement was restrained by his injuries and the resulting necessary medical treatment, and this restraint was for medical purposes by medical personnel rather than investigative purposes by law enforcement.

Defendant was not threatened in any way or coerced to make any statements to Captain Amburn. The trial court found that Defendant "immediately engaged" in conversation with Captain Amburn and gave "spontaneous" statements that were "not the result of any kind of interrogation." Captain Amburn explained to Defendant that he was there to obtain a blood sample pursuant to a search warrant, and Captain Amburn never told Defendant that he was under arrest. The trial court found that Captain Amburn asked only one question that elicited an incriminating response. Defendant made statements acknowledging that he had "screwed up" before Captain Amburn indicated to Defendant that he was a suspect. Although Captain Amburn asked Defendant's relatives to leave the room, he explained that he did so to limit Defendant's embarrassment. There is no evidence that the interaction between Captain Amburn and Defendant extended beyond the reasonable amount of time necessary to obtain a sample of Defendant's blood. Captain Amburn did not arrest Defendant at the hospital, and Defendant was not arrested until several months later.

Under our supreme court's precedent and the persuasive authority cited above, we cannot conclude that under the totality of the circumstances, a reasonable person in Defendant's position would have "consider[ed] himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *Anderson*, 937 S.W.2d at 852; *see State v. Fridley*, 93 N.E.3d 10, 20-22 (Ohio Ct. App. 2017) (concluding that the hospitalized defendant was not in custody when an officer questioned him while obtaining a sample of defendant's blood pursuant to a search warrant). Defendant failed to establish that he was in custody when he made the statements to Captain Amburn. Thus, Defendant's statements were not taken in violation of *Miranda* and his constitutional right against self-incrimination.

### 4. Voluntariness of Defendant's Statements

Defendant asserts that the combination of the injuries that he sustained in the crash and the medication that he received at the hospital rendered his statements to Captain Amburn involuntary. The State responds that the evidence established that Defendant's statements were voluntary. We agree with the State.

The Fifth and Fourteenth Amendments of the United States Constitution and article I, section 9 of the Tennessee Constitution require that a confession be voluntary before it is admitted at trial. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000); *State v. Davidson*, 509 S.W.3d 156, 189 (Tenn. 2016); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *Smith*, 933 S.W.2d at 455. The voluntariness test is distinct from *Miranda*. *Dickerson*, 530 U.S. at 434-35; *State v. McKinney*, 669 S.W.3d 753, 767 (Tenn. 2023). "*Miranda* asks whether a suspect received certain warnings and knowingly and voluntarily waived certain rights, while the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 433-35; *Smith*, 933 S.W.2d at 455).

The due process voluntariness test requires consideration of "the totality of the circumstances surrounding the giving of a confession, 'both the characteristics of the accused and the details of the interrogation.'" *Id.* (quoting *Dickerson*, 530 U.S. at 434). Relevant factors include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)) (alteration in original).

"The ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000) (appendix); *see State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985) (providing that "intoxication or mental unsoundness is not alone sufficient to bar the introduction of statements made by an accused if the evidence also shows the accused was capable of understanding his rights"). A confession should be suppressed "'when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect.'" *Morris*, 24 S.W.3d at 805 (quoting *State v. Robinson*, 622

S.W.2d 62, 67 (Tenn. Crim. App. 1980)); *see State v. Williams*, No. W2018-00797-CCA-R3-CD, 2019 WL 1452931, at *11 (Tenn. Crim. App. Mar. 29, 2019).  The test is "whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime."  *Morris*, 24 S.W.3d at 805 (citations omitted); *see Williams*, 2019 WL 1452931, at *11.

The States argues that "Defendant failed to show that he was so intoxicated or impaired by his medications that his statements could not be considered the product of a free mind and rational intellect."  However, as Defendant notes in his reply brief, the State has the burden of establishing the voluntariness of a confession by a preponderance of the evidence.  *See State v. Willis*, 496 S.W.3d 693, 695 (Tenn. 2016) (citing *State v. Sanders*, 452 S.W.3d 300, 305 (Tenn. 2014)).  The parties also note that the trial court failed to make specific findings on the issue of voluntariness.  However, neither party argues that a remand for additional findings by the trial court is necessary, and we have recognized that in such situations, we may decide where the preponderance of the evidence lies.  *See Freeland*, 451 S.W.3d at 816; *Hicks*, 55 S.W.3d at 521.

The proof did not demonstrate that Defendant's facilities were so impaired that his confession cannot be considered the product of a free mind and rational intellect.  The only witness who testified regarding Defendant's condition when he made the statements was Captain Amburn, who stated that Defendant "was very lucid in his conversation" and did not appear to be incapacitated because of any medication.  Captain Amburn testified, "I didn't detect any of the things that, in my professional experience, would leave me to believe that he was heavily—heavily medicated.  He had no slurred speech; he was articulate in what he was saying; he wasn't searching for his words."  The trial court found that Defendant "immediately engaged in conversation" with Captain Amburn and offered statements that were "spontaneous and not the result of any kind of interrogation."  Defendant admitted that he was the driver, that he had been drinking alcohol, and that he had fled from law enforcement.  While Captain Amburn acknowledged that Defendant "wince[d]" when he moved due to his injuries, the evidence does not demonstrate that his injuries otherwise affected the voluntariness of his statements.  Although Dr. Lochmuller and Special Agent Tiller testified at trial regarding fentanyl, propofol, and Versed, their testimony was limited to the general effects of the medication based on the dosage administered and not those effects actually experienced by Defendant.  Rather, the evidence established that Defendant's statements were voluntary, and the proof does not preponderate against the trial court's denial of Defendant's motion to suppress.  *See Morris*, 24 S.W.3d at 805-06 (concluding that the defendant's statements were voluntary when the officer testified that the defendant did not appear to be under the influence of cocaine and provided a narrative of the events and when expert testimony was limited to the general effects of cocaine intoxication and not those effects that the defendant actually experienced).

**B. Chain of Custody of Blood Sample**

Defendant contends that the trial court erred in admitting evidence of the blood sample from the medical draw and the TBI's analysis of the sample and asserts that the State failed to establish a valid chain of custody. He maintains that the State failed to present evidence regarding the drawing of the blood, the handling and preservation of the sample until seized by law enforcement, and the storage of the sample after it was seized by law enforcement and before it was transported to the TBI. The State responds that the trial court acted within its discretion by admitting the results of the TBI's testing of the blood sample from the medical draw after the State established an unbroken chain of custody. We agree with the State.

Prior to trial, Defendant filed a motion to exclude evidence regarding the TBI's analysis of the blood sample from the medical draw, asserting that the State could not establish a sufficient chain of custody, and the State filed a response in opposition. The trial court denied the motion prior to trial, noting the State's responsibility to establish chain of custody at trial. Defendant renewed his objection at trial, and the trial court denied Defendant's motion, finding that "there's absolutely no reason to doubt the integrity of the blood from the period of time it was in the hospital" and that Officer Bules "did describe every step of the chain from the beginning until it got to [the] TBI."

Tennessee Rule of Evidence 901 requires that physical evidence be authenticated prior to its admission, and authentication requires evidence sufficient "to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). "[I]t is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (quoting *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)). This rule "is designed to insure 'that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id.* (quoting *Scott*, 33 S.W.3d at 760).

Although each link in the chain of custody "should be sufficiently established," the State need not prove the identity of tangible evidence "beyond all possible doubt" or "establish facts which exclude every possibility of tampering." *Id.* (citing *Scott*, 33 S.W.3d at 760). "An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item." *Id.* "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* This court reviews the trial court's ruling regarding whether the chain of custody has been sufficiently established for an abuse of discretion. *Id.* at 295.

The challenged blood sample in this case was not taken for the sole purpose of forensic testing by the TBI in the investigation of a criminal offense. *See State v. Singh*, 684 S.W.3d 774, 784 (Tenn. Crim. App. 2023) (describing evidence sufficient to establish proper chain of custody of a blood sample taken for purposes of forensic analysis by the TBI in DUI cases). Rather, the blood sample was taken by hospital staff for the purposes of diagnosis and treatment of injuries that Defendant sustained from the crash. The hospital conducted various testing on the blood sample in preparation for Defendant's surgery, including a blood alcohol test, before the blood sample was provided to law enforcement pursuant to a search warrant and transported to the TBI for forensic testing. Defendant's medical records reflecting the results of the blood alcohol testing by the hospital were entered as an exhibit at trial without objection prior to and separate from the admission of his entire medical records.

We note that when hospital staff obtain blood samples from a patient for purposes of diagnosis and treatment and test those samples to determine the patient's blood alcohol level, the medical records documenting the testing and the results are admissible under the business records exception to the hearsay rule set forth in Tennessee Rule of Evidence 803(6). *See State v. Goldston*, 29 S.W.3d 537, 540-42 (Tenn. Crim. App. 1999); *see also State v. Asbury*, No. E2008-01641-CCA-R3-CD, 2010 WL 1741365, at *9 (Tenn. Crim. App. Apr. 30, 2010); *State v. Warlick*, No. M2005-01477-CCA-R3-CD, 2007 WL 1439648, at *7 (Tenn. Crim. App. May 17, 2007). "Hospital records kept daily for medical purposes and not prepared for the purpose of litigation are typically deemed reliable," *Goldston*, 29 S.W.3d at 542, and "the trustworthiness of the medical record is presumed," *Warlick*, 2007 WL 1439648, at *6. The State is not required to present additional witnesses regarding the drawing and storing of the blood sample to admit the medical records. *See Asbury*, 2010 WL 1741365, at *9 (rejecting the defendant's claim that medical records reflecting the results of blood alcohol testing conducted by the hospital for medical purposes lack sufficient trustworthiness to satisfy Rule 803(6) due to the State's failure to present testimony regarding how and why the tests were conducted).

Because the State need not establish the chain of custody of blood samples taken at a hospital for medical purposes to admit medical records reflecting the results of blood alcohol testing conducted by hospital personnel due to the reliability of the records, we question the necessity of requiring the State to establish the chain of custody of blood samples while in the hospital's custody prior to their transfer to the custody of law enforcement for forensic analysis by the TBI. As noted by the State in its brief, the hospital had a "vested interest in ensuring that the blood labeled with Defendant's name belonged to Defendant" because the hospital drew the blood for the purpose of conducting testing and screening in advance of Defendant's major surgery. The crucial life and death decisions by hospital personnel are dependent upon the proper obtaining, handling, and

preserving of blood samples. Under such circumstances, we conclude the presentation of evidence to establish the chain of custody of blood samples while under the custody and care of the hospital was not necessary to preclude the possibility of tampering, loss, substitution, or mistake.

Regardless, even assuming the State is required to establish the integrity of the blood samples while in the hospital's custody, we conclude that the State presented sufficient evidence establishing the chain of custody of the blood samples. According to Defendant's medical records, he arrived at the emergency department on February 3, 2016, at 8:32 p.m. and was evaluated by a doctor, who ordered "Type & Screen for possible transfusion." Hospital personnel drew Defendant's blood at 20:38 hours, or 8:38 p.m. Dr. Christy Lawson issued an order to screen Defendant's blood, and following a blood screen, hospital personnel noted that Defendant had a "BAC 135; EtOH positive." On February 4, at approximately 5:33 p.m., Captain Amburn and Officer Bules executed a search warrant for Defendant's medical blood samples. They went to the hospital's laboratory, provided a technician with a copy of the search warrant, and received four vials of blood from the technician. The vials were labeled with the name, "Harlen Ferguson," the same spelling of Defendant's name included in his medical records. The label also included the date and time of February 3 at 8:38 p.m., the same date and time of the drawing of Defendant's blood that was listed in his medical records.

Officer Bules took possession of the blood samples, transported them to the evidence room at the KCSO, and placed them in a refrigerator at the forensic laboratory. The refrigerator was located behind a door that was only accessible with a thumbprint and a key card. Any removal of evidence from the register had to be recorded in an evidence log. According to the evidence log, the vials of Defendant's blood remained in the refrigerator until February 19, 2016, when Tom Finch, an employee with the KCSO, removed the vials from the laboratory refrigerator and transported them to the TBI for analysis.

Defendant characterizes the period between Officer Bules's placing the vials of blood in the refrigerator and Mr. Finch's removing them from the refrigerator and transporting them to the TBI as a "gap" in the chain of custody. Defendant relies on this court's opinion in *State v. Gibson*, when we held that the State failed to establish the chain of custody of a blood sample when the deputy delivered the sample to an unidentified person in the forensic department of the sheriff's office and no one from the forensic department testified regarding what he or she did with the sample after receiving it. *State v. Gibson*, No. E2017-01567-CCA-R3-CD, 2018 WL 4811086, at *6-7 (Tenn. Crim. App. Oct. 3, 2018). This court reasoned that "the State failed to offer any evidence about the whereabouts and security of the Defendant's blood sample from the time [the deputy] gave it to the Forensic Department until it was received in the TBI Laboratory's evidence drop

- 34 -

box six days later." *Id.* at *8. We noted that the State also failed to present any evidence regarding "the sheriff's department's usual procedures for storing, securing, and transporting evidence." *Id.* In the present case, however, Officer Bules testified that she stored Defendant's blood samples in the forensic department's refrigerator located in a secured area in the KCSO. According to the evidence log, the vials remained inside the refrigerator until Mr. Finch removed them and transported them to the TBI. The KCSO's waiting fifteen days to transport the vials to the TBI did not create a "gap" in the chain of custody.

The State also presented sufficient evidence establishing the identity and integrity of the blood samples. The blood vials were labeled with Defendant's name as spelled in his medical records and the same date and time listed in his medical records as when the blood was drawn, evidencing that the vials contained Defendant's blood. Defendant's medical records included the screens and tests that hospital personnel conducted using Defendant's blood samples and the results of the screens and tests. Captain Amburn and Officer Bules went to the hospital laboratory to obtain the blood samples pursuant to a search warrant and retrieved the vials from a technician in the laboratory, evidencing that the vials had been stored in the hospital laboratory. Officer Bules then stored the vials in the laboratory refrigerator in a secured area at the KCSO until the vials were transported to the TBI for analysis.

Special Agents Tiller and Thompson testified extensively regarding the condition of the blood samples when they received them and the dangers that result from contaminating and failing to properly store the samples. Special Agent Tiller stated that he did not note any issues with clotting or bacterial growth in the blood samples. Special Agent Tiller likewise stated that he did not observe anything "abnormal" in the blood samples and that he took precautions to ensure that the testing instrument did not produce a result that was based on any contamination of the blood samples.

We conclude that this proof was sufficient to ensure that "'there has been no tampering, loss, substitution, or mistake'" with respect to the blood samples from the medical draw. *Cannon*, 254 S.W.3d at 296 (quoting *Scott*, 33 S.W.3d at 760). The trial court did not abuse its discretion in admitting the results of the TBI's analysis of Defendant's blood samples from the medical draw.

Furthermore, we conclude that any error in admitting the evidence was harmless. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); *see also Cannon*, 254 S.W.3d at 298-99 (applying a harmless error analysis under Rule 36(b) in determining the effect of the erroneous admission of

evidence due to the State's failure to establish a sufficient chain of custody). In addition to the results of the TBI's analysis of the blood samples, the State also presented Defendant's medical records, documenting the result of the hospital's blood alcohol testing of the blood samples as "BAC 135, EtOH positive." This medical record was entered as an exhibit without objection by Defendant prior to and apart from the entry of the entire set of Defendant's medical records. Other evidence of Defendant's intoxication that was presented at trial included Mr. Sumner's testimony regarding Defendant's alcohol consumption prior to the crash, the reckless way Defendant drove the vehicle, and his statements following the crash regarding his alcohol consumption and intoxication. In light of the other evidence of Defendant's intoxication presented at trial, we cannot conclude that any error in the admission of the result of the TBI's analysis of the blood samples "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." Tenn. R. App. P. 36(b). Defendant is not entitled to relief on this issue.[3]

## C. Failure to Preserve Evidence

Defendant asserts the State failed to preserve his blood samples from the medical draw and the legal draw and the vehicle involved in the crash in violation of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), and that the trial court, therefore, erred in denying his motion to dismiss. Defendant argues that due to the destruction of the blood samples, he was denied the opportunity to have the blood samples independently tested to corroborate or contradict the results of the TBI's analysis. He further argues that due to the State's failure to retain the vehicle involved in the crash, he was denied the opportunity to inspect the vehicle. He maintains that the photographs of the vehicle taken by the KCSO were an insufficient substitute because the photographs were of poor quality and did not include "crucial aspects" of the vehicle, including the condition of the passenger door and the vehicle's interior. Finally, Defendant asserts that the trial court improperly blamed him for failing to request access to the vehicle and the blood samples in a timely manner when the evidence was destroyed prior to his arrest and the appointment of counsel. The State responds that Defendant failed to establish that his trial was fundamentally unfair without the evidence, and the State asserts that the trial court

---

[3] Defendant argues in a footnote in his brief that because the State did not present the hospital personnel who drew his blood and handled his blood samples as witnesses at trial, he was "thus convicted on the basis of evidence introduced against him without any opportunity to confront the unknown people who generated that evidence." Defendant, however, has waived this issue by failing to cite any authority to support his claim. *See* Tenn. R. App. P. 27(a)(7)(A) (requiring an appellant to support issues raised on appeal with "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record"); Tenn. Ct. Crim. App. R. 10(b) (providing that issues raised by an appellant that "are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived").

properly concluded that a jury instruction was the appropriate remedy for the missing evidence.

*1. Pretrial and Trial Proceedings*

Prior to trial, Defendant filed a motion to dismiss the vehicular homicide charges in the presentment due to the State's failure to preserve the vehicle involved in the crash in violation of *Ferguson*. Defendant alleged that the KCSO released the vehicle to the insurance company shortly after the crash and that the vehicle was subsequently sold and destroyed. He maintained that the State had a duty to preserve the evidence and that defense access to view and inspect the vehicle and the event data recorder ("EDR") or "black box" was required under Tennessee Rule of Criminal Procedure 16. He further maintained that inspection of the vehicle was necessary for preparation of the defense regarding the issues relating to the nature and cause of the crash and the proximate cause of the victim's death. Defendant asserted that the evidence could not be recreated and that no comparable substitute evidence existed. Defendant also filed a motion to dismiss the presentment due to the State's failure to preserve the blood samples, asserting that the blood samples contained material evidence that directly related to the elements of the charged offense and that could provide evidence to impeach the TBI's analysts who tested the samples and that no comparable substitute evidence existed.

During a pretrial hearing, Captain Amburn testified regarding the vehicle's condition following the crash. He stated that the force of the impact was so great that the engine was shoved against the firewall, moving the dashboard and the pedals and that the steering column rotated to such a degree that the steering wheel was facing the vehicle's roof. Captain Amburn recalled looking inside the vehicle before it became fully engulfed in flames and observing beer cans, but he did not collect the beer cans and was unaware of whether an investigator later did so. He said that Defendant's airbag was deployed on the driver's side and that he believed the victim's airbag on the passenger's side also had deployed. Captain Amburn noted that the front passenger seat was "partially reclined." Captain Amburn did not inspect the vehicle after it was towed and explained, "There was nothing left of it, basically." The parties stipulated that at the request of the KCSO, the vehicle was towed from the scene by Cedar Bluff Towing, that Chief Henderson released all holds on the vehicle on February 8, 2016, and that the vehicle was claimed by Insurance Auto Auctions on February 16, 2016.

Officer Campbell testified that she took approximately 161 photographs of the scene on the night of the crash. She was unable to enter the vehicle because it was still "very hot" due to the fire. She photographed the debris from the vehicle, the vehicle's exterior, and the vehicle's interior to the extent that she could do so. She acknowledged that the area was dark, and she did not recall whether there was any lighting in the area or

whether the officers set up temporary lighting while investigating the crash. She did not recall inspecting the vehicle's windows, doors, or airbags, and she did not photograph the vehicle once it was towed from the scene. She photographed the roadway but did not otherwise document its condition.

At the pretrial hearing, Defendant presented the testimony of James Alan Parham, a civil engineer who specializes in traffic accident reconstruction, and the trial court accepted Mr. Parham as an expert in the field. Mr. Parham reviewed the accident report, photographs of the scene, the transcript of the 911 call, the medical examiner's report, documents from Insurance Auto Auctions regarding the vehicle, chain of custody forms, the search warrant affidavit, subpoenas, and "other legal documents."

Mr. Parham noted that an accident reconstruction was not performed in the case. He testified regarding the importance of maintaining and preserving evidence at the scene of a vehicle crash. He stated that an investigator should have examined, documented, and photographed the roadway alignment, the grade of the roadway, the cross slope, the banking of the curve, the vehicle's path as it left the roadway, ground conditions, the tree that the vehicle struck, and the vehicle's final resting position. Mr. Parham acknowledged that investigators photographed the marks where the vehicle left the roadway, the "furrows" or grooves in the ground made by the tires once the vehicle left the roadway, and the path of the vehicle to the site of the crash. He did not see any measurements of the marks and "furrows."

Mr. Parham testified that law enforcement failed to preserve the vehicle, obtain the EDR data from the vehicle, or conduct a detailed assessment of the vehicle. He stated that this assessment should have included photographing and documenting the overall dimensions of the vehicle, the damage to the vehicle, the seat belt latch plates to determine whether the seat belts were used, any airbag deployment, the speedometer, the positions of the seats, and the size, tread, depth, and conditions of the tires. Mr. Parham stated that the photographs taken by officers were dark, that no photographs of the vehicle were taken during the daylight hours, and that he did not "really see" any photographs of the vehicle's interior taken by law enforcement "other than just standing back a little bit and you can kind of see in there." He stated that officers failed to take detailed photographs of the steering wheel, dash, airbags, or any remains of the seat belts. He also was unable to determine whether the vehicle's windows were up or down based on the evidence provided by the State. He stated that had the State preserved the vehicle, he would have been able to inspect the vehicle's interior, including the steering wheel, dashboard, airbags, and seat belts. He noted that it was not unusual for vehicles involved in crashes to be preserved for long periods of time.

- 38 -

Mr. Parham testified that the data from the vehicle's EDR could have included the vehicle's speed, the position of the throttle, the accelerator and brake activity, any seat belt usage, any activation of steering control, the degree to which the steering wheel was turned, the engine RPMs, the crash pulse, and the direction of the force involved in the crash. He concluded that based on his training and experience, EDR data was available for 2010, 2011, and 2012 Kia Souls. He identified a document that noted the lack of tools for downloading and accurately interpreting data from an EDR in Kia vehicles produced prior to September 1, 2012. Mr. Parham stated that he had performed several accident reconstructions where the vehicle had caught fire and that he had been able to obtain the EDR and the recorded data from some, but not all, of the burned vehicles. He did not know whether the data from the EDR in the vehicle survived the fire but believed "it's got a high probability it would have."

Captain Amburn's testimony regarding the collection of Defendant's blood samples from the legal draw and the medical draw pursuant to search warrants was consistent with his trial testimony. The State also presented the testimony of the TBI forensic scientists who received and analyzed the blood samples.

Ms. Margaret Massengill testified that the TBI received the blood samples taken from both the medical draw and the legal draw. According to the submittal forms, the medical draw occurred on February 3, 2016, at 8:38 p.m. and was received by the TBI on February 19, and the legal draw occurred on February 4 at 4:16 a.m. and was received by the TBI on March 1. Ms. Massengill testified that on February 8, she spoke to one of the prosecutors regarding which of the samples to test and that they decided to test the samples from the medical draw if the volume of blood was sufficient to allow such testing. If the volume of blood from the medical draw was insufficient for testing, the TBI would then test the blood from the legal draw. Ms. Massengill also testified that generally, the blood sample taken closer in time to "the event in question" is the most "useful" sample to test as it is a better representation of whether the person was under the influence of alcohol or drugs at the time of the event.

The samples from the medical draw were in four tubes, the first of which had a blue top and contained approximately one milliliter of blood, the second of which had a purple top and contained approximately two milliliters of blood, the third of which had a green top and contained less than one milliliter of blood, and the fourth of which was an "SST tube" that separated the red cells from the serum and contained approximately one milliliter of serum. Ms. Massengill used the serum from the "SST tube" to conduct presumptive testing; Special Agent Thompson used the blood in the tube with the purple top for an alcohol analysis; and due to the limited amount of blood available, Special Agent Tiller used the blood from the tubes with the purple and blue tops for a drug analysis. Ms. Massengill testified that the presumptive test required approximately 100

microliters of serum, that the alcohol analysis required approximately 200 microliters of blood, and that the drug analysis required a total of approximately two and one-half to three and one-half milliliters of blood.

Ms. Massengill was unaware of who drew the blood from the medical draw, the storage of the blood samples in the hospital, any preservatives added to the blood, and any testing of the blood at the hospital. She testified regarding the risks associated with the failure to include any preservatives or other additives, and she acknowledged that the tubes of blood from the medical draw were not vacuum sealed. She stated that if any of the analysts had questioned the integrity of the blood samples, they would have refused to test them. The TBI did not conduct any DNA testing of the blood samples from the medical draw to determine whether the blood belonged to Defendant. Ms. Massengill noted that each of the tubes were labeled with Defendant's name and were dated February 3, 2016, at 8:38 p.m. and that the information on the labels matched the information on the form requesting analysis that was submitted to the TBI.

The samples from the legal draw were in two ten-microliter, gray-topped tubes, which were the standard tubes included in the blood-alcohol kit provided by the TBI to law enforcement officers. The tubes were vacuum sealed and contained an anticoagulant to prevent the blood from clotting and a preservative to stop the metabolic process. Ms. Massengill acknowledged that any Versed and fentanyl in amounts larger than therapeutic levels that were in the blood samples would have been detected in a drug analysis.

Ms. Massengill testified that the blood samples were destroyed on September 1, 2016, in accordance with TBI policy. She explained that the destruction policy is due to the limited space available to store blood samples for long periods of time. She stated that the TBI can retain blood samples for a longer period if requested by the District Attorney General's Office or upon receipt of a court order but that she was not aware of any requests to preserve the blood samples or to send the blood samples for independent testing prior to their destruction. On June 1, 2017, Ms. Massengill learned that defense counsel had contacted the TBI and requested information about the blood samples, and Ms. Massengill notified defense counsel of their destruction.

Special Agent Thompson offered testimony regarding his alcohol analysis of the blood sample from the medical draw that was consistent with his trial testimony. He tested the whole blood from the tube with the purple top, and a total of 100 microliters of blood was consumed by the testing. He did not test the blood samples from the legal draw, explaining that the blood samples from the medical draw were taken closer to the time of the crash and, therefore, were a better representation of Defendant's condition at the time of the crash.

- 40 -

Special Agent Tiller also offered testimony regarding his drug analysis of the blood sample from the medical draw that was consistent with this trial testimony. He used the whole blood from the tubes with the purple and blue tops to conduct his analysis, and his analysis consumed all the blood in both tubes. He explained that the TBI uses whole blood in its drug and alcohol testing and that literature and other references state that whole blood is required for drug and alcohol analysis. He stated that his testing used all the remaining whole blood in the samples from the medical draw and that there was an insufficient amount of serum or plasma left from the samples for the TBI to conduct further testing. Special Agent Tiller also stated that based on his knowledge of testing used at other laboratories, he believed the amount of serum remaining was insufficient for another laboratory to conduct a full analysis.

Special Agent Tiller did not analyze the blood samples from the legal draw. He stated that he learned that the District Attorney General's Office preferred that the blood samples from the medical draw be analyzed. He explained that due to the backlog of blood samples that required testing, the TBI did not test samples when informed that such testing was unnecessary. Special Agent Tiller also stated that, generally, he preferred testing blood samples taken closer to the incident in question as the samples were a more accurate representation of the person's condition at the time of the incident. He said that due to the rate at which drugs and alcohol metabolize, the amount of drugs and alcohol in a blood sample that was drawn eight hours after a crash "should be significantly lower than what they were at the time of the crash." He acknowledged that another laboratory could have tested the blood sample from the legal draw for fentanyl and Versed.

During a subsequent hearing, the trial court made oral findings denying both of Defendant's motions to dismiss. The court found that the blood samples remained with the TBI for six or seven months before they were destroyed pursuant to the policy of the TBI, "which like all law enforcement agencies has only a limited amount of space for storage." The court stated that the samples were not destroyed "for any legal trick to take advantage of [Defendant]." The court found that Defendant failed to take any steps to have the samples independently tested prior to their destruction and that although the samples were destroyed before Defendant had been appointed counsel, "that doesn't mean that he had no obligations to take action to try to protect himself." The court noted that Defendant knew that samples of his blood had been taken, that he "surely understood" that the samples would undergo blood and alcohol analysis, and that he had the right to ask the TBI to send the blood samples to an independent laboratory for analysis but failed to do so prior to their destruction.

In denying Defendant's motion to dismiss due to the State's failure to retain the vehicle, the trial court noted that although the vehicle was not destroyed for several months, Defendant made no attempt to preserve or inspect the vehicle. The court also

noted that although Defendant had not been charged with a criminal offense when the vehicle was destroyed, Defendant "had an obligation . . . to understand that he was in trouble." However, the court characterized Defendant's failure to take any action as "a background consideration." Rather, the court denied the motion upon finding that Defendant's argument as to the exculpatory or potentially exculpatory nature of the evidence was "based on speculation." The court found that there was nothing in the record supporting Defendant's claim that inspection of the vehicle likely would have revealed a mechanical failure, which prevented the driver from controlling the vehicle. The court stated that although Defendant spoke to officers at the hospital, he never claimed a mechanical failure prevented him from controlling the vehicle, which would have placed the State on notice of Defendant's defense and the need to retain the vehicle.

At the conclusion of the State's proof at trial, however, the trial court ruled that a jury instruction on the State's duty to preserve evidence was appropriate due to the State's failure to preserve the vehicle. The court explained, "I think it's fair to say that the—what was left of the car would have had some exculpatory evidence. We just don't know. It's just a completely speculative notion. But the threshold here is [to] produce at trial evidence which may possess exculpatory value." The court noted that although Defendant did not complain of a mechanical failure, "if the car had been preserved and an expert did examine it, it's possible that something could have turned up that would be of some sort of exculpatory [value]." The court subsequently instructed the jury:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

> If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

### 2. State v. Ferguson

In *State v. Ferguson*, the Tennessee Supreme Court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *Ferguson*, 2 S.W.3d

at 915-16). Our supreme court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 916-17 n.10). "[F]undamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* (citing *Ferguson*, 2 S.W.3d at 914, 917).

Under this "balancing approach," the trial court must first "determine whether the State had a duty to preserve the evidence." *Id.* at 785. The State's duty to preserve is "limited to constitutionally material evidence." *Id.* (citing *Ferguson,* 2 S.W.3d at 917). To be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Id.* (citing *Ferguson*, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

(1) the degree of negligence involved;

(2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

(3) the sufficiency of the other evidence used at trial to support the conviction.

*Id.* (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 785-86 (citing *Ferguson*, 2 S.W.3d at 917).

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *See id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned

on appeal absent a showing that the trial court abused its discretion. *Id*. at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

### 3. Blood Samples

Generally, "the State has a duty to preserve all evidence subject to discovery and inspection under [Tennessee Rule of Criminal Procedure] 16, or other applicable law." *Ferguson*, 2 S.W.3d at 917. This court has determined that a blood sample is discoverable under Rule 16. *See State v. Blair*, No. M2015-01231-CCA-R3-CD, 2016 WL 6776356, at *5 (Tenn. Crim. App. Nov. 16, 2016). Furthermore, Tennessee Code Annotated section 55-10-408, which sets forth the testing of samples taken for the purpose of determining alcohol and/or drug content, provides that "[t]he person tested shall be entitled to have an additional sample of blood or urine procured and the resulting test performed by any medical laboratory of that person's own choosing and at that person's own expense[.]" Tenn. Code Ann. § 55-10-408(e). However, the State's duty to preserve evidence under *Ferguson* "is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917); *see California v. Trombetta*, 467 U.S. 479, 488 (1984). Thus, we must examine whether the blood samples potentially possessed exculpatory value and were of such a nature that Defendant was unable to obtain comparable evidence by other reasonably available means. *See Merriman*, 410 S.W.3d at 785.

The State's duty to preserve evidence "'does not extend to that which the State cannot preserve,' such as evidence that is consumed during testing or is too dangerous to retain." *State v. Leath*, 461 S.W.3d 73, 98 (Tenn. Crim. App. 2013) (quoting *State v. Best*, No. E2007-00296-CCA-R3-CD, 2008 WL 4367259, at *14 (Tenn. Crim. App. Sept. 25, 2008)). Furthermore, "the State is not required to preserve samples taken for the limited purpose of determining the defendant's blood-alcohol level." *State v. Jordan*, 325 S.W.3d 1, 82 (Tenn. 2010) (appendix) (citing *Trombetta*, 467 U.S. at 491). "It is common knowledge that human blood is perishable, and specimens of blood can only be maintained for a short period of time." *Id.*

The record reflects that the TBI analysts used all the whole blood from the medical draw in conducting their analyses, and Special Agent Tiller testified that an insufficient amount of serum remained for analysis by an independent laboratory. Thus, the State did not have a duty to retain the blood samples from the medical draw. The blood samples from the legal draw taken more than eight hours after the crash were not potentially exculpatory because the lack of drugs or alcohol in the blood samples would not have

negated evidence of Defendant's intoxication at the time of the crash due to the rate at which drugs and alcohol metabolize.

Furthermore, the blood samples were not destroyed due to negligence. Most of the blood samples from the medical draw were consumed during testing, and the remaining amount of the samples from the medical draw, as well as the samples from the legal draw, were destroyed in accordance with established TBI policy. Prior to the TBI's analysis, the hospital tested the blood from the medical draw, and the results of the testing established that Defendant's blood-alcohol level was greater than the legal limit. As we have recognized, the other evidence of Defendant's intoxication presented at trial was substantial. Finally, we note that Defendant questioned witnesses extensively at trial regarding the destruction of the blood samples and the potential value of independent testing. The trial court instructed the jury on the State's duty to preserve evidence and the jury's ability to infer that the absent evidence would have been favorable to Defendant. Although the trial court's decision to give this instruction was based on the State's failure to preserve the vehicle, the language of the instruction was not limited to the State's failure to preserve the vehicle. Under these circumstances, we conclude that the State's failure to preserve the blood samples did not violate Defendant's right to a fair trial and that the trial court properly denied Defendant's motion to dismiss.

### 4. Vehicle

The trial court declined to dismiss Defendant's charges due to the State's failure to retain the vehicle for inspection by the defense. However, at the close of the State's proof, the trial court found that an inspection of the vehicle could have produced exculpatory evidence and concluded that a missing evidence instruction was warranted. Although the trial court did not expressly find that a trial without the missing evidence would be fundamentally unfair, a missing evidence instruction is a remedy that a trial court may impose to protect a defendant's right to a fair trial upon making such a finding. *See Merriman*, 410 S.W.3d at 785-86. Thus, we must determine whether the trial court abused its discretion in deciding to issue a missing evidence instruction rather than dismiss the case. *See id.* at 792 (recognizing that appellate courts review the trial court's choice of remedy for abuse of discretion).

The KCSO did not destroy or lose the vehicle but released it to the victim's family upon request. As noted by the trial court, Defendant's claim regarding the probative value of the defense's ability to inspect the vehicle is merely speculative. *See State v. Rimmer*, 623 S.W.3d 235, 260 (Tenn. 2021) (noting that the defendant's offering only speculation as to the probative value of being able to physically inspect the vehicle used during the commission of a murder as a factor in determining that the State's release of the evidence back to the owner did not violate the defendant's due process rights). The KCSO officers

- 45 -

took numerous photographs of the burned vehicle prior to releasing it, and Defendant had access to those photographs. To the extent that Defendant claims that the photographs were insufficient to demonstrate the condition of the vehicle, Defendant was allowed to explore these claims through his cross-examination of witnesses at trial. Finally, other evidence presented at trial establishing that Defendant was the driver, that he was intoxicated, and that his driving while intoxicated was the proximate cause of the crash and the victim's death was overwhelming. Based on these circumstances, we conclude that the trial court did not abuse its discretion in issuing a missing evidence instruction rather than dismissing the case. Defendant is not entitled to relief on this issue.

### D. Admission of Lay Witness Testimony

Defendant challenges the trial court's decision to admit Captain Amburn's testimony that a red mark on the victim appeared to have been caused by the seat belt on the passenger's side. Defendant maintains that Captain Amburn, as a lay witness, was permitted to describe seeing a red mark on the victim, but he was prohibited from offering an interpretation or opinion as to the cause of the red mark. The State responds that the trial court acted within its discretion in admitting Captain Amburn's testimony regarding his observation of the red mark on the victim and the apparent cause of the mark. We agree with the State.

At trial, Captain Amburn testified that following the crash, the victim indicated that her stomach was hurting and that he saw "a red line across her stomach area and up toward her cheek that looked consistent with a seat belt." Defendant objected to the testimony, arguing that the testimony was speculative, that Captain Amburn "has not been qualified as an expert in any field," and that he had no medical knowledge. The trial court overruled the objection, finding that Captain Amburn was "just expressing what it looked like." Captain Amburn then testified that he had worked numerous vehicle accidents during his twenty-eight years in law enforcement and that the victim's injury "was consistent with a seat belt and the danger there is I've seen people die from spleen injuries and everything." He noted that the red mark was on the victim's right side, the same side on which the passenger's side seat belt would go across the passenger's body.

A non-expert witness may give testimony in the form of an opinion or inference if it is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Lay opinion testimony should be based on admissible facts that are in evidence. *State v. Boggs*, 932 S.W.2d 467, 474 (Tenn. Crim. App. 1996). To be admissible, lay opinion testimony should be within the range of knowledge or understanding of ordinary laypeople. *Id.* A witness's lay opinion testimony is admissible when the jury could not readily draw its own conclusions on the issue without the

witness's lay opinion or where the witness cannot effectively testify without stating the inference or opinion. *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007). "If an opinion is based upon a lay witness's own observations, his or her conclusions require no expertise and are within the range of common experience, the opinion is admissible." *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007). "The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992), *superseded by statute as stated in State v. Reynolds*, 635 S.W.3d 893 (Tenn. 2021); *see State v. Cook*, No. W2012-00406-CCA-R3-CD, 2013 WL 9570493, at *8 (Tenn. Crim. App. Sept. 4, 2013) (listing examples of lay testimony). A trial court's decision regarding the admissibility of opinion evidence is reviewed for abuse of discretion. *Schiefelbein*, 230 S.W.3d at 130.

Tennessee courts have permitted lay witness testimony regarding the apparent cause of an injury based on the injury's appearance in a variety of circumstances. For example, in *State v. Samuel*, this court upheld the admission of a police officer's testimony that a mark on the victim appeared "recent" and as if someone had dug a fingernail into the victim's skin as proper lay opinion testimony and within the common knowledge of the general public. *Samuel*, 243 S.W.3d at 603 (noting also that Tennessee common law traditionally permitted lay opinions regarding the physical condition of a witness or another person). In *State v. Brown*, our supreme court upheld the admission of the testimony of a nurse who testified as a lay witness and identified an injury as a cigarette burn based on her observation of other such injuries on numerous occasions over six years. *Brown*, 836 S.W.2d at 549. Our supreme court reasoned:

> Generally, non-expert witnesses must confine their testimony to a narration of the facts based on first-hand knowledge and avoid stating mere personal opinions or their conclusions or opinions regarding the facts about which they have testified. This rule preserves the province of the jury as the fact-finding body designated to draw such conclusions as the facts warrant. An exception to this general rule exists where testimony in an opinion form describes the witness's observations in the only way in which they can be clearly described, such as testimony that a footprint in snow looked like someone had slipped or that a substance appeared to be blood.

*Id.* at 550 (internal citations omitted). Our supreme court, however, also concluded that a paramedic's testimony that bruising around a child's eyes was indicative of skull trauma was improperly admitted as lay opinion testimony because the testimony called for specialized skill or expertise. *Id.* at 549-50.

- 47 -

Since *Brown*, this court has upheld the admission of a pediatrician's testimony that bruises on a child looked like fingerprints and shoe prints "[b]ecause a lay witness could have offered the same opinions without error," and this court also upheld the admission of a police officer's testimony that the same marks were fingerprints. *State v. Greenwood*, No. M2013-01924-CCA-R3-CD, 2014 WL 6609308, at *33-34 (Tenn. Crim. App. Nov. 21, 2014); *see also State v. Bishop*, No. M2015-00314-CCA-R3-CD, 2016 WL 7324307, at *8 (Tenn. Crim. App. Dec. 16, 2016) (upholding the admission of a police officer's testimony that a bruise appeared to be a handprint); *State v. Scott*, No. W2009-00707-CCA-R3-CD, 2011 WL 2420384, at *24 (Tenn. Crim. App. June 14, 2011) (upholding the admission of lay testimony that an injury looked like a shoe print). Recently, this court concluded that a trial court did not abuse its discretion in admitting lay testimony from a police officer that the marks on a victim were not consistent with strangulation and that the officer observed "redness" under the victim's collarbone. *State v. Cheatham*, No. E2021-01241-CCA-R3-CD, 2023 WL 3025199, at *14 (Tenn. Crim. App. Jan. 6, 2023), *perm. app. denied* (Tenn. June 13, 2023). This court reasoned that the officer's "opinion was rationally based on her perception and helpful to the determination of a fact in issue" and that the officer's testimony "utilized reasoning employed in everyday life rather than a process of reasoning familiar only by specialists in the field." *Id.*

Captain Amburn testified that he had responded to numerous vehicular accidents during his career in law enforcement and that the red mark across the victim's stomach and upward toward her cheek "looked consistent with a seat belt." Captain Amburn's opinion was rationally based on his perception and was helpful to the determination of a fact at issue. His testimony was based on a process of reasoning familiar with everyday life rather than a process of reasoning mastered only by specialists in a particular field. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the testimony. We note that the jury viewed photographs of the victim's injuries and was able to compare the photographs and the medical examiner's testimony that the pattern of the victim's injuries was not necessarily consistent with a seat belt to Captain Amburn's testimony. Defendant is not entitled to relief on this issue.[4]

### E. Admission of Defendant's Medical Records

Defendant maintains that the trial court erred in admitting the entire set of his medical records totaling approximately 1,500 pages based on the rule of completeness in Tennessee Rule of Evidence 106 after the defense introduced a portion of the records listing the items that were in Defendant's possession when he arrived at the hospital

---

[4] We note that Captain Amburn also testified that Defendant's leg injuries appeared consistent with the damage to the vehicle's interior on the driver's side. Defendant did not object to this testimony at trial and does not challenge this testimony on appeal.

following the crash. Defendant contends that the admission of the entire set of medical records was not necessary to provide "context" to the portion of the records that he introduced, to prevent the jury from being misled, or to assist the jury in understanding the portion of the records that he introduced. The State responds that Defendant waived plenary review of the issue by failing to object to the introduction of the records at trial and that he failed to otherwise establish plain error in the admission of the records. Defendant filed a reply brief, asserting that he challenged the introduction of the evidence at trial and that even if plenary review of the issue is waived, the trial court's admission of the entire set of medical records was plain error.

Prior to jury selection on the first day of trial, the State announced its intention to seek to admit the entire set of Defendant's medical records from the hospital as business records pursuant to Tennessee Rule of Evidence 803(6) and included the accompanying affidavit. Defendant objected and argued that the admission of the entire set of records, which totaled approximately 1,500 pages, "would be a waste of this Court's time and everyone else's time because there's no way that they can in a reasonable amount of time look through [1,500] pages." Defendant also argued that the records were not relevant and included inadmissible hearsay. The State responded that the medical records were admissible as business records, that the entire set of records should be admitted "for matters of completeness," and that the State planned to publish to the jury only those records that the State believed to be more relevant. The trial court sustained Defendant's objection regarding the blanket admission of the entire set of records. The court found that although medical records fall within the business records exception to the hearsay rule, the court must also consider the "relevance and materiality" of the records. The court stated that the State could seek to introduce individual pages of the records at trial, at which time the court would rule on any objections by Defendant.

During direct examination of Dr. Lochmuller at trial, the State admitted without objection an affidavit of the medical records custodian of Defendant's medical records and one page of the medical records, which stated "BAC 135; EtOH positive." The State then called Detective Lane as a witness, and during cross-examination, defense counsel showed Detective Lane one page from Defendant's medical records, which Detective Lane stated appeared to be Defendant's patient property list. Detective Lane testified that the list included one cigarette, a pocketknife, and a comb but that no keys were listed. Defendant sought to admit the document into evidence, and the State requested "the whole records in for completeness." The trial court replied, "Very well," and the following exchange occurred:

> [DEFENSE COUNSEL]: They're asking for all fifteen hundred pages.

THE COURT: Well, there's not much way around it. If they want it in, under the rule of completeness—

[DEFENSE COUNSEL]: Okay.

THE COURT: --it goes in.

The court admitted a compact disc of the entire set of Defendant's medical records as an exhibit. Prior to the conclusion of its proof, the State entered individual pages from Defendant's medical records as a separate exhibit to allow the jury to take the pages with them during deliberations. One page stated, "Patient admits to EtOH tonight. Patient states he was running from the police and had an accident. Patient states air bags did deploy. Patient states he was not wearing his seat belt. Patient was drug out of vehicle by rescue." Other records listed Defendant's injuries. A note from February 4, 2016, at 4:37 a.m. stated that "[t]he patient was alert and oriented, in obvious pain, able to answer questions appropriately." Finally, a case management note entered on February 8, 2016, stated, "Met with patient and his friend, Greg Webb, patient was driver in motor vehicle crash in which his fiancée with whom he lived was killed. Patient no longer has a place to live."

The State asserts that Defendant failed to object at trial to the admission of the entire set of medical records and, therefore, waived plenary view of the issue on appeal. We conclude that defense counsel's statements to the trial court prior to the admission of the evidence, when viewed with defense counsel's statements made in challenging the same evidence prior to the trial, were sufficient to preserve a challenge to the admission of the evidence for purposes of appeal.

Tennessee Rule of Evidence 106, often referred to as the rule of completeness, provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Rule 106 is "intended to ensure that the jury can assess related information without being misled by considering only portions of an item of evidence." *State v. McCaleb*, 582 S.W.3d 179, 187 (Tenn. 2019) (citing *State v. Hartman*, 42 S.W.3d 44, 61 (Tenn. 2001)). Rule 106

- 50 -

reflects a concern for fairness and is designed to let the jury assess related information at the same time rather than piecemeal. This should help the jury avoid being misled by hearing only partial information about a writing or recorded statement. Moreover, it will assist the jury in assessing the weight to be given to the written or recorded statement by permitting the jury to consider at the same time other relevant writings and recordings.

Neil P. Cohen, et al., *Tennessee Law of Evidence* § 1.06[2][a] (6th ed. 2011) (footnotes omitted); *see State v. Torres*, 82 S.W.3d 236, 252 (Tenn. 2002).

The controlling question under Rule 106 is "whether the jury's accurate understanding of the evidence already admitted requires the admission of this additional information." *State v. Vaughn*, 144 S.W.3d 391, 407 (Tenn. Crim. App. 2003). "Rule 106 addresses two concerns: (1) the misleading impression created by taking matters out of context, and (2) the inadequacy of repair work when the admission of the disputed proof is delayed to a point later in the trial." *Id.* (internal citations omitted). The evidence proffered under Rule 106 must be relevant and either explain or qualify the already-admitted proof. *Id.* (citation omitted). Because Rule 106 is a rule of fairness, the proffered evidence must either "(1) explain[ ] the already-admitted proof; (2) place[ ] the admitted proof in context; (3) avoid[ ] misleading the trier of fact; or (4) ensure[ ] a fair and impartial understanding of the already-submitted proof." *Id.* (citations omitted). We review a trial court's determination under Rule 106 for an abuse of discretion. *See State v. Keough*, 18 S.W.3d 175, 183 (Tenn. 2000).

In granting the State's request to admit all 1,500 pages of Defendant's medical records under the rule of completeness, the trial court commented that "there's not much way around it. If they want it in, under the rule of completeness . . . it goes in." However, when a party introduces "a writing or recorded statement or part thereof," the adverse party may require the production of "any other part or any other writing or recorded statement" if the additional portion of the writing or recorded statement is relevant and explains or qualifies the already-admitted proof. *See Vaughn*, 144 S.W.3d at 407. The trial court made no findings regarding the relevancy of the 1,500 pages of medical records or how the entire set of medical records explained or qualified the portion of the medical records listing the items in which Defendant was in possession when he arrived at the hospital. Accordingly, we conclude that the trial court erred in allowing the State to introduce all 1,500 pages of Defendant's medical records under the rule of completeness in Tennessee Rule of Evidence 106.

However, we conclude that the error was harmless. *See* Tenn. R. App. P. 36(b); *see also State v. Brewer*, No. W2017-01725-CCA-R3-CD, 2019 WL 1109917, at *15 (Tenn. Crim. App. Mar. 11, 2019) (reviewing the trial court's error under Tennessee Rule

of Evidence 106 under the harmless standard set forth in Tennessee Rule of Appellate Procedure 36(b)). This court has recognized that Rule 106 "is a rule of timing rather than admissibility." *Vaughn*, 144 S.W.3d at 406; *see also Denton v. State*, 945 S.W.2d 793, 801 (Tenn. Crim. App. 1996) ("The rule assumes that the remaining portion of the statement would be ultimately admissible."). We note that during the trial, the State also sought to admit the complete set of medical records under the business records exception to the hearsay rule pursuant to Tennessee Rule of Evidence 803(6), but the trial court denied the State's request. Defendant argues in his brief that "[t]he medical records would not have been admissible in their entirety as business records, given the amount of hearsay and double-hearsay contained within." *See State v. Rucker*, 847 S.W.2d 512, 516 (Tenn. Crim. App. 1992) ("The mere fact that documents are admissible as evidence pursuant to Rule 803(6), Tenn. R. Evid., does not mean that every entry contained in the documents can be admitted into evidence."), *overruled on other grounds by State v. McLeod*, 937 S.W.2d 867, 870 (Tenn. 1996). Defendant asserts that the State used the erroneously admitted evidence by pointing "to the statement in one medical record in which he allegedly admitted that he was the driver, along with other statements that he ran from the police and that he had consumed alcohol" and by quoting "portions of the record which identify [Defendant] as 'the driver' and [the victim] as the passenger."

The State presented overwhelming evidence at trial that Defendant was the driver and was intoxicated at the time of the crash. Evidence of Defendant's intoxication included Mr. Sumner's testimony regarding Defendant's alcohol consumption prior to the crash, the reckless manner in which Defendant drove the vehicle, the medical record showing the results of blood alcohol testing by the hospital which was admitted at trial prior to and separate from the complete set of Defendant's medical records, and Defendant's statements to Captain Amburn regarding his alcohol consumption and intoxication. Evidence that Defendant was the driver included his position in the driver's seat when officers and Mr. Hickey approached the vehicle, the injuries to his leg consistent with the damage to the vehicle's interior on the driver's side, the victim's position outside the vehicle on the passenger's side shortly after the crash, Captain Amburn's testimony that a red mark across the victim's stomach appeared consistent with the seat belt on the passenger's side, and Defendant's statements to Captain Amburn and Mr. Sumner while at the hospital. In light of the overwhelming evidence presented at trial that Defendant was the driver and was intoxicated, we cannot conclude that the erroneous admission of the complete set of Defendant's medical records "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." Tenn. R. App. P. 36(b). Defendant is not entitled to relief on this issue.

## F. Exclusion of Evidence

Defendant contends that the trial court's exclusion of evidence violated his constitutional right to present a defense. He specifically challenges the trial court's exclusion of (1) expert testimony from Mr. Parham regarding the inadequacies of law enforcement officers' investigation of the crash, (2) evidence that the District Attorney General's Office instructed the TBI not to test Defendant's blood sample from the legal draw, and (3) evidence of other car accidents involving Chief Henderson while in his KCSO-issued vehicle. The State responds that Defendant is not entitled to relief on any of his claims.

The United States Constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Our supreme court also has recognized that the right to present a defense is "a fundamental element of due process of law." *State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)).

The right to offer testimony from witnesses, however, is not absolute. *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). "'In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence.'" *Id*. (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). Our supreme court has recognized that "[r]ules of procedure and evidence are designed to assure fairness and reliability in the criminal trial process" and that "[s]o long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *Id*. (citations omitted). As a result, a trial court's ruling regarding the admissibility of evidence, generally, does not rise to the level of constitutional error. *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2004), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136 (Tenn. 2021). However, "the erroneous exclusion of evidence that thwarts a criminal defendant's right to present a defense is constitutional error." *State v. Bell*, 512 S.W.3d 167, 190-91 (Tenn. 2015) (citing *Rice*, 184 S.W.3d at 673). In determining whether the trial court's erroneous exclusion of evidence violated a defendant's constitutional right to present a defense, this court must consider "whether the excluded proof is critical to the defense; whether it bears sufficient indicia of reliability; and whether the interest supporting exclusion of the proof is substantially important." *Id*. at 191 (citing *Rice*, 184 S.W.3d at 673).

## 1. Mr. Parham's Testimony

During a jury-out hearing at trial, the defense announced its intention to present Mr. Parham as a witness, and the State objected to the admission of the evidence and argued that his testimony was irrelevant. The State argued that Mr. Parham would be "merely speculating" on what an accident reconstruction could have revealed had one been conducted and that such speculation would not substantially assist the jury as the finder of fact. Defense counsel responded that "we have a right to ensure that the jury understands what evidence could have been collected, could have been preserved, and could have been tested at the scene." Defense counsel stated that she did not plan to question Mr. Parham in the depth in which she questioned him during the pretrial hearing. She said that she planned to ask Mr. Parham to explain an accident reconstruction report, a survey, and a "black box" and to identify any documentation by the State regarding the vehicle's condition. Defense counsel noted that she did not plan to ask Mr. Parham to draw any conclusions from the evidence and would question him regarding "what he does every day in his field which is to do accident reconstruction. And he's simply going to explain to the jury the evidence that could have been obtained, but was not." Defense counsel argued that the testimony met the requirements of Tennessee Rules of Evidence 702 and 703 and that the exclusion of the evidence would violate Defendant's right to present a defense.

The State argued that testimony regarding what an accident reconstruction entails was cumulative to evidence that had already been presented and that testimony regarding what an investigation could have shown was speculative. Defense counsel responded that because the defense theory was that law enforcement failed to properly investigate the crash, the jury would "have to know what a proper investigation looks like." Defense counsel continued, "I'm not going to go into great detail on that. I have just a few questions. I have double spaced five pages which shouldn't take me but fifteen minutes. But I don't intend to go into great detail about anything regarding the concerns that they've had here." She also stated, "I'm just asking very basic questions about evidence that can be obtained and preserved and why it's important."

The trial court observed:

> Well, the problem, of course, is there is no car. There is nothing to reconstruct. There's no evidence for him to examine, and so whether he talks for 15 minutes or talks for three hours, at the end of all this, if we did do the three hours, the jury might know a lot more about the accident reconstruction. They might know a whole lot more about safety equipment that's available today.

But the evidence will not make any fact of consequence to the determination of this case more or less probable to be true. He cannot tell us anything about the intoxication or lack of intoxication of the driver, he can't tell us anything about who was driving the vehicle. He can't even tell us anything about the vehicle itself. He's never seen it, never laid a hand on it.

Defense counsel responded that the defense had "a right to show the State didn't do [its] job at the time it was investigating this case to determine proximate cause." Defense counsel argued that law enforcement failed to determine whether the vehicle had a mechanical failure and failed to examine the scene to determine whether the crash occurred due to an item in the roadway or on the side of the road. Defense counsel noted Captain Amburn's testimony that at one point, the vehicle "bottomed out in a ditch," and defense counsel argued that the vehicle went "straight . . . through the field" without leaving skid marks and that "one could infer that perhaps something went wrong with the vehicle." Defense counsel further argued that "we have a right for the jury to hear that if the vehicle had been maintained, both the black box would have possibly indicated what went wrong, and so would have a physical observation of the vehicle."

The trial court recognized that the defense's "strongest argument" to the jury based on Mr. Parham's testimony was that "[i]f an accident reconstruction expert had examined the car, that expert might have found something that would be important to this case." The court found that this testimony "doesn't make any fact of consequence at issue in this case more or less likely to be true." Recognizing its role as gatekeeper of the evidence, the court ordered that Mr. Parham "won't be able to testify about any, any possible results of an accident reconstruction with respect to this car or the scene of the crime because it never took place."

Defense counsel announced the intention to present Mr. Parham as a rebuttal witness "as to the evidence that is available." The trial court responded "certainly. I'll let you use him any way I can." However, after a break, defense counsel announced that the defense would not be calling Mr. Parham as a witness.

On appeal, Defendant asserts that the trial court erred in excluding Mr. Parham's testimony regarding the "inadequacies of the investigation." The appellate record does not clearly reflect the portion of Mr. Parham's testimony that Defendant sought to present and that the trial court excluded. At the conclusion of the hearing, defense counsel announced that she was relying on Mr. Parham's testimony during the pretrial *Ferguson* hearing as a proffer. The transcript of Mr. Parham's pretrial testimony is more than eighty pages. Defense counsel initially argued during the jury-out hearing that Mr. Parham's trial testimony would be more limited than his pretrial testimony. As the jury-out hearing

progressed, defense counsel seemingly expanded the portion of Mr. Parham's pretrial testimony that the defense was seeking to admit. However, defense counsel only referenced Mr. Parham's testimony in general terms and did not cite to the transcript from the pretrial hearing or otherwise specify the portions of Mr. Parham's pretrial testimony set forth in the transcript that the defense sought to admit at trial.

Furthermore, contrary to Defendant's claim on appeal, the trial court did not exclude Mr. Parham's entire testimony. Rather, when defense counsel announced her intention to present Mr. Parham as a rebuttal witness "as to the evidence that is available," the trial court replied, "[C]ertainly. I'll let you use him any way I can." Defendant chose not to call Mr. Parham as a witness at trial, and the record does not otherwise indicate the portion of Mr. Parham's testimony "as to the evidence that is available" that the trial court did not exclude.

To further complicate matters, Defendant did not include citations in his appellate brief to Mr. Parham's testimony from the pretrial hearing that Defendant alleges the trial court erred in excluding at trial. *See* Tenn. R. App. 27(a)(7)(A) (requiring that an appellant's brief include "appropriate references to the record (which may be quoted verbatim) relied on"); *see also* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Thus, Defendant essentially invites us to review the more than eighty pages of transcript of Mr. Parham's pretrial testimony, determine which portions of the testimony that Defendant sought to admit at trial, and then determine whether the testimony was excluded under the trial court's ruling. We respectfully decline such an invitation.

Nevertheless, we cannot conclude that the trial court's general ruling excluding Mr. Parham's testimony of "any possible results of an accident reconstruction with respect to this car or the scene of the crime" was error or otherwise violated Defendant's right to present a defense. The admission of expert testimony is governed by Tennessee Rule of Evidence 702, which provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Expert testimony, like other evidence, must be relevant in order to be admissible. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible."). Relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Questions regarding the admissibility and relevance of evidence generally lie within the discretion of the trial court, and this court will not "interfere with the exercise of that discretion unless a clear

abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

The record supports the trial court's decision regarding the admissibility of Mr. Parham's testimony. Mr. Parham did not conduct an accident reconstruction, and his testimony regarding what an accident reconstruction could have found had one been conducted is speculative. Defendant never claimed in his statements to police that the vehicle had mechanical issues, and no evidence was presented at trial indicating that the crash was the result of mechanical issues. While Defendant asserts on appeal that Mr. Parham's testimony was relevant to establish that law enforcement conducted an inadequate investigation, the trial court granted Defendant the opportunity to challenge the adequacy of law enforcement's investigation and conclusions by presenting Mr. Parham's testimony regarding "the evidence that is available." Defendant chose not to take advantage of this opportunity. Given the speculative nature of the excluded evidence, Defendant's challenge to the adequacy of the investigation through extensive cross-examination of the State's witnesses at trial, and Defendant's decision to not present testimony from Mr. Parham regarding "the evidence that is available," we conclude that the excluded evidence was not critical to Defendant's defense. The trial court properly exercised its discretion in excluding the evidence, and the exclusion of the evidence did not violate Defendant's right to present a defense.

### 2. *Prosecutor's Statements to the TBI*

Defense counsel asked Special Agent Tiller during cross-examination why he did not test the blood sample from the legal draw. The State objected, asserting that the question called for inadmissible hearsay. Defense counsel argued that the statement from a prosecutor in the District Attorney General's Office not to test the blood sample was an instruction and, therefore, was not hearsay. The trial court sustained the State's objection, finding that the statement was hearsay, but the trial court allowed defense counsel to ask Special Agent Tiller whether he was instructed by someone with the TBI not to test the sample. When defense counsel did so, Special Agent Tiller testified, "There was a note put into the case file by forensic technician Margaret Massengill that a phone call—[.]" The State objected based on hearsay, and the trial court sustained the objection and informed Special Agent Tiller that he was not to testify as to "what that note said."

On appeal, Defendant contends that the prosecutor's statement to the TBI not to test the blood sample from the legal draw was an instruction and, therefore, was not hearsay. Defendant maintains that the trial court erred in excluding the evidence and that the exclusion of the evidence violated his constitutional right to present a defense. As noted by the State in its brief, Defendant did not challenge the exclusion of the testimony on constitutional grounds at trial. Accordingly, Defendant has waived plenary review of

his constitutional challenge on appeal. *See* Tenn. R. App. P. 36(a); *see also State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020) (concluding that the defendant waived his constitutional challenge to the trial court's evidentiary ruling on appeal when he objected at trial based on a non-constitutional ground but then asserted a constitutional ground for the objection in his motion for new trial). Although Defendant filed a reply brief, he did not respond to the State's waiver argument or otherwise request review under plain error. The first and best way to obtain plain error review is to ask for it. "To be clear, a party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do with all other issues in the ordinary course of an appeal." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023) (citing Tenn. R. App. P. 27(a)), *no perm. app. filed*. Moreover, "[w]here a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief." *State v. Thompson*, No. W2022-1535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*. Because no "particularly compelling or egregious circumstances" exist, we decline to consider plain error relief of Defendant's claim that the exclusion of the evidence violated his constitutional right to present a defense. Our review is limited to whether the trial court's ruling violated the Tennessee Rules of Evidence.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801. "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay.

"The standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The factual and credibility findings made by the trial court when considering whether a statement is hearsay "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id*. (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule— are questions of law subject to de novo review." *Id*. (citing *Schiefelbein*, 230 S.W.3d at 128; *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the court must exclude the statement. But if a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Id*.

On appeal, Defendant contends that "[a]ny statement made by [the prosecutor] to Margaret Massengill giving her directions not to test the second sample was not hearsay."

*See State v. Guinn*, No. W2013-01436-CCA-R3-CD, 2014 WL 3513000, at *7 (Tenn. Crim. App. July 15, 2014) (noting that "commands, instructions, and questions often are not hearsay because they are not offered to prove the truth of their content"). At trial, Defendant sought to present the testimony through Special Agent Tiller, who was not a party to the conversation between the prosecutor and Ms. Massengill. Rather, Special Agent Tiller's knowledge regarding the decision not to test the sample from the legal draw was based on a note left in the file, which the trial court excluded as another layer of hearsay. Regardless of whether the prosecutor's statement to Ms. Massengill constituted hearsay, Defendant does not challenge the trial court's finding that Special Agent Tiller's testimony regarding the note in the file likewise constituted inadmissible hearsay. The trial court subsequently admitted testimony from Ms. Massengill that the decision to test only the sample from the medical draw was based on her conversation with the prosecutor. Accordingly, Defendant has failed to establish that he is entitled to relief on this issue.

### 3. Chief Henderson's Other Automobile Accidents

Defendant sought to cross-examine Chief Henderson at trial regarding three other automobile accidents in which he was involved. Defendant specifically sought to question Chief Henderson regarding an automobile accident that occurred in December 2015 during which his KCSO-issued vehicle and another vehicle collided in an intersection, resulting in the other driver's being charged with DUI. The DUI charge was still pending at the time of Defendant's trial. The other driver alleged that there was a conspiracy to blame her for the accident; she sued both Chief Henderson and Knox County, and a settlement was reached for damage to the other driver's vehicle. The second incident about which Defendant sought to question Chief Henderson occurred in 1997 when the vehicle which Chief Henderson was driving rear-ended another vehicle, and Chief Henderson maintained that his brakes had failed. The final incident occurred in 2016 when Chief Henderson was injured while attempting to stop his vehicle, which began rolling after he stepped out of the vehicle at his home.

The trial court excluded the evidence finding that the probative value of the evidence did not outweigh its prejudicial effect. The court noted that the State used Chief Henderson's testimony at trial to "offer more evidence that they have that the Kia was driving in a reckless fashion, ran off the road, hit a tree" and that the defense thoroughly cross-examined Chief Henderson, challenging his conduct, the propriety of releasing the vehicle within five days of the accident, and "a number of things." The court stated that "[g]iven the state of the evidence and the use to which this witness's testimony was actually used by the State," the court did not find that "the probative value of the . . . irregularities in these other separate, unrelated traffic evidence outweighs the prejudicial effects on the accused's character."

On appeal, Defendant does not challenge the trial court's exclusion of the evidence under the Tennessee Rules of Evidence but contends that the exclusion of the evidence violated his constitutional right to present a defense. However, as noted by the State, Defendant did not argue at trial that the exclusion of the evidence violated his constitutional right to present a defense. Thus, he has waived plenary review of this issue on appeal. *See* Tenn. R. App. P. 36(a); *see also Vance*, 596 S.W.3d at 253. Although Defendant filed a reply brief, he did not respond to the State's waiver argument or otherwise request review under plain error. *See Funk*, 2023 WL 7130289, at *3; *Thompson*, 2023 WL 4552193, at *5. Because no "particularly compelling or egregious circumstances" exist, we decline to consider plain error relief. *See Thompson*, 2023 WL 455193, at *5.

## G. Missing Witness Jury Instruction

Defendant challenges the trial court's denial of his request for a missing witness instruction due to the State's failure to call Trina Gregory, the forensic technician who was with Captain Amburn at the hospital when Defendant made statements to him, as a witness at trial. Defendant maintains that Officer Gregory had knowledge of material facts, was aligned with the State by nature of her employment and was not "equally available" to both parties. Defendant argues that the failure to provide the instruction was not harmless. The State responds that Officer Gregory's testimony would have been cumulative to the proof presented at trial and that the trial court properly denied Defendant's request for the instruction. We agree with the State.

Prior to the close of proof at trial, Defendant filed a written request for a missing witness instruction due to the State's failure to call Officer Gregory as a witness. During a hearing outside the jury's presence, defense counsel argued that Officer Gregory was a material witness because she was in the hospital room with Captain Amburn and Defendant when Defendant made the statements about which Captain Amburn testified but failed to record. Defense counsel also argued that because Officer Gregory had been with the KCSO, she was within the State's control. Defense counsel stated that the defense sent a subpoena to Officer Gregory at the KCSO, was informed that she was no longer employed with the KCSO, was not provided with her contact information, and was otherwise unable to locate her for service. The State argued that Officer Gregory was not a material witness because her testimony would have been cumulative to Captain Amburn's testimony and that the instruction was "unfair" in that it would allow the jury to assume that the State was hiding Officer Gregory's testimony. The trial court denied Defendant's request for a missing witness jury instruction, stating, "Well, this is a very serious matter. It suggests that the State's hiding proof, hiding evidence, and I don't think the defense has made a sufficient showing to justify that."

The constitutional right to trial by jury, *see* U.S. Const. amend VI; Tenn. Const. art. I, § 6, imposes upon the trial court a duty "to give a complete charge of the law applicable to the facts of a case," *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see also* Tenn. R. Crim. P. 30. We review the legal accuracy of the trial court's instructions de novo with no presumption of correctness, *see Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007), and the propriety of a given instruction de novo with a presumption of correctness, *see Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004).

Under the missing witness rule,

> a party is entitled to argue, and have the jury instructed, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions.

*State v. Middlebrooks*, 840 S.W.2d 317, 334 (Tenn. 1992) (citation omitted). To support a missing witness instruction, the party requesting it must establish that "'the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial.'" *State v. Bigbee*, 885 S.W.2d 797, 804 (Tenn. 1994) (quoting *Middlebrooks*, 840 S.W.2d at 334-35; *Delk v. State*, 590 S.W.2d 435, 449 (Tenn. 1979)), *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223, 242-43 (Tenn. 2024). The requirement of unavailability of the missing witness means not only that the witness was "not within the subpoena power of the trial court," *State v. Philpott*, 882 S.W.2d 394, 407 (Tenn. Crim. App. 1994), but also that the witness "must not have been equally available to both parties." *State v. Boyd*, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992).

The State is "under no obligation to produce every possible witness." *Hicks v. State*, 539 S.W.2d 58, 59 (Tenn. Crim. App. 1976). A party's failure to produce a witness who may have some knowledge of the fact alone does not justify application of the inference. *State v. Francis*, 669 S.W.2d 85, 88-89 (Tenn. 1984). When it can be said "with reasonable assurance that it would have been natural for a party to have called the absent witness but for some apprehension about his testimony," the jury may draw an inference that the testimony would have been unfavorable. *Id.* The inference does not arise "where the only object of calling such witness would be to produce corroborative, cumulative, or possibly unnecessary evidence." *State v. Rickman*, No. W2020-00882-CCA-R3-CD, 2021 WL 2255509, at *4 (Tenn. Crim. App. June 3, 2021) (citations omitted).

The record does not indicate that Officer Gregory possessed unique or essential information from which a negative inference could have been drawn due to the State's failure to call her as a witness at trial. As noted by the State on appeal, the proof presented at trial established that Defendant directed his statements at the hospital to Captain Amburn and that Officer Gregory had no independent role in the conversation. The only objective in calling Officer Gregory as a witness would have been to produce corroborative or cumulative evidence. Given Officer Gregory's limited role in the case and the cumulative nature of her testimony, it cannot be said "with reasonable assurance" that the State naturally would have called Officer Gregory as a witness but for some apprehension about her testimony. Accordingly, the trial court properly denied Defendant's request for a missing witness instruction.

## H. Closing Arguments

Defendant asserts that the State repeatedly misstated the evidence during closing arguments by (1) presenting a demonstrative slide stating that Dr. Lochmuller "admitted that if the seat were in the reclined position, [the] seat would leave marks in those same areas," (2) arguing that Mr. Hickey heard sirens and saw Defendant fighting with the airbags, and (3) arguing that Mr. Sumner could smell marijuana being smoked while standing near Defendant. The State responds that Defendant has waived these arguments and has otherwise failed to establish that he is entitled to relief. Defendant argued in his reply brief that he properly preserved the issues for appeal and that even if plenary review of the issue is waived, he is entitled to relief when the statements are reviewed for plain error.

Closing arguments serve "to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008) (citations omitted). Because counsel in criminal cases are "expected to be zealous advocates," they are afforded "great latitude in both the style and the substance of their arguments." *Id.* at 130-31 (citations omitted). "[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Id.* at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (citations omitted). Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or

prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id*. The following factors should be considered when making this determination:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6.

### 1. Dr. Lochmuller's Testimony

Defendant maintains that the prosecutor intentionally misrepresented Dr. Lochmuller's testimony at trial regarding whether the marks on the victim's body were caused by a seat belt. Defendant asserts that during closing arguments, the prosecutor showed the jury a slideshow with a slide stating that Dr. Lochmuller "[a]dmitted that if the seat were in the reclined position, [the] seat would leave marks in those same areas."

The slideshow is not included in the appellate record, and the prosecutor did not make the challenged statement to the jury. Once the prosecutor stated during the initial closing argument that "[t]here was a lot of talk about these marks on [the victim's body]," defense counsel asked to approach the bench. During the bench conference, defense counsel stated that "it says, 'Admitted that if the seat were in the reclined position, [the] seat would leave marks in those same areas.'" The State argued that the statement was an accurate reflection of Dr. Lochmuller's testimony, and the trial court told defense counsel that he would be granted the opportunity to argue otherwise.

The record does not reflect whether the challenged slide was shown to the jury prior to or after the bench conference. Following the bench conference, the prosecutor listed for the jury the abrasions on the victim's body about which Dr. Lochmuller testified,

acknowledged that Dr. Lochmuller testified that he saw no pattern injuries on the victim, argued that Dr. Lochmuller "said that if the seat were reclined, it wouldn't be in the same areas that you would expect to see pattern injuries," and noted that the passenger seat was reclined. The prosecutor then stated that the "State submits that these marks that you see on [the victim's] face and her stomach were due to that seat belt because she was in that reclined position at the time of impact." The record reflects that the prosecutor's argument was a reasonable inference based on the evidence presented at trial.

It is an appellant's duty to provide a "record which conveys a fair, accurate[,] and complete account of what transpired with respect to the issues which form the basis of the appeal." *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999) (citing Tenn. R. App. 24(b)). "[I]n the absence of an adequate record, this court must presume the trial court's ruling was correct." *State v. Worthington*, No. W2018-01040-CCA-R3-CD, 2019 WL 2067926, at *6 (Tenn. Crim. App. May 8, 2019) (citing *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993)). Because the appellate record does not include the slide to which Defendant objected and the record does not reflect that the challenged slide was shown to the jury before or after the bench conference or that the prosecutor otherwise made the challenged statement to the jury, Defendant has failed to establish that the prosecutor intentionally misstated the evidence.

## 2. Testimony from Mr. Hickey and Mr. Sumner

Defendant alleges that the prosecutor intentionally misstated the evidence by arguing that Mr. Hickey testified to hearing sirens when the two police cars drove by him around the time of the crash, that Mr. Hickey saw Defendant "fighting with the air bags" following the crash, and that Mr. Sumner testified that while he was "standing very near" Defendant, he "could smell active marijuana being smoked." However, Defendant did not contemporaneously object to the State's argument in the trial court. Our supreme court "has long held that a defendant's failure to contemporaneously object to alleged prosecutorial misconduct during closing argument results in waiver of the issue on appeal." *State v. Enix*, 653 S.W.3d 692, 700 (Tenn. 2022). Defendant argues that the State's arguments rise to the level of plain error. "[P]lain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *Id*. at 700-01.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

"(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

The record reflects that Defendant did not contemporaneously object to the prosecutor's statements. During a subsequent bench conference, defense counsel stated that the prosecutor made multiple inaccurate statements to which defense counsel did not object because "I can address that." Thus, the record reflects that defense counsel made a strategic decision to forgo an objection and, instead, address the prosecutor's argument during the defense's own closing argument. Accordingly, Defendant failed to establish that he did not waive the issue for tactical reasons. *See Smith*, 24 S.W.3d at 282. Furthermore, the challenged comments by the prosecutor were brief; defense counsel had the opportunity to address the comments during the defense's closing argument; the trial court instructed the jury that the arguments of counsel were not evidence; the jury acquitted Defendant of the charges related to any marijuana use; and the evidence of guilt for his convictions is overwhelming. Defendant has failed to establish that consideration of the alleged errors is "necessary to do substantial justice," *id.*, or that any such error was of "'sufficient magnitude that it probably changed the outcome of the trial,'" *Martin*, 505 S.W.3d at 504 (quoting *Smith*, 492 S.W.3d at 232). Because Defendant failed to establish plain error, he is not entitled to relief on this issue.

## I. *Brady* Claim

Defendant asserts that the State withheld evidence that shortly before the September 2019 trial, Captain Amburn was reprimanded for failing to report a superior officer's misconduct during an incident that occurred in April 2019. Defendant argues that the evidence was material for purposes of impeachment in that the evidence would have "cast doubt" on Captain Amburn's credibility, would have shown that Captain Amburn "was willing to participate in an attempted cover-up of the wrongdoing of a

superior officer," and would have been directly connected to the defense's claim that Captain Amburn engaged in "misconduct" in the instant case and took actions to prevent the discovery of Chief Henderson's alleged "misconduct."  The State responds that Defendant failed to establish that the evidence was material.

In *Brady v. Maryland*, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  The Tennessee Supreme Court has held that to establish a *Brady* violation, a defendant must show that (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release the information regardless of whether it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material.  *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).

At trial, the defendant bears the burden of proving a *Brady* violation by a preponderance of the evidence.  *Id*.  Appellate courts "review the lower court's 'findings of fact, such as whether the defendant requested the information or whether the state withheld the information . . . de novo with a presumption that the findings are correct unless the evidence preponderates otherwise.'"  *State v. Thomas*, 687 S.W.3d 223, 253 (Tenn. 2024) (quoting *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004)). "[C]onclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness."  *Id*. (quoting *Cauthern*, 145 S.W.3d at 599).

Evidence "favorable to the accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001).  Put another way, favorable evidence "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness."  *Id*. at 56-57 (citation omitted).

One of the core requirements of *Brady* is that the information allegedly withheld must have been material.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985); *Edgin*, 902 S.W.2d at 389.  The Supreme Court has expounded the definition of "material" evidence as follows:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with

the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435; *see also Johnson*, 38 S.W.3d at 58.

We conclude that Defendant has failed to establish a *Brady* violation. Evidence related to Captain Amburn's reprimand does not undermine confidence in the verdict. The incident involving the intoxicated officer and Captain Amburn's reprimand occurred more than three years after Defendant's crash and was unrelated to the crash. Captain Amburn explained that he did not report the 2019 incident because he was competing with the officer for a promotion and did not want to be accused of attacking the officer to gain an advantage. Defendant asserts that this evidence is relevant to his claim that Captain Amburn took actions to prevent the discovery of Chief Henderson's alleged misconduct in the instant case. However, no evidence of a scheme by Captain Amburn and Chief Henderson to concoct evidence against Defendant was presented at trial. At the most, Defendant established that mistakes were made in the investigation, but such mistakes are insufficient to establish a conspiracy against Defendant. The fact that Captain Amburn failed to report an incident involving other officers in an unrelated matter that occurred more than three years after Defendant's crash does not lead to the conclusion that Captain Amburn engaged in deceptive practices in the instant case. Furthermore, a general attack on Captain Amburn's credibility based on the 2019 incident is insufficient to cast doubt over all the evidence presented at trial establishing Defendant's guilt. Because Defendant has failed to establish that evidence of the 2019 incident is material, he is not entitled to relief on this issue.

## J. Coram Nobis

Defendant challenges the trial court's denial of his petition for writ of error coram nobis based on newly discovered evidence of misconduct by Chief Henderson. Defendant asserts that the trial court erred by concluding that he was not entitled to a hearing on the 1997 Jeremy Justice incident due to his failure to exercise reasonable diligence in discovering the incident. Defendant also asserts that the trial court erred by concluding that he failed to establish that evidence of Chief Henderson's illegal conduct may have resulted in a different judgment. The State responds that the record supports the trial court's decision to deny Defendant's petition. We agree with the State.

The writ of error coram nobis is an "*extraordinary* procedural remedy . . . into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1992) (emphasis in original) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides:

> The relief obtainable by this proceeding shall be confined to errors [outside] the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different result, had it been presented at the trial.

"The relief sought by a writ of error coram nobis is the setting aside of the conviction and the granting of a new trial." *Clardy v. State*, 691 S.W.3d 390, 400 (Tenn. 2024) (citing *Payne v. State*, 493 S.W.3d 478, 485 (Tenn. 2016)). The decision to grant or deny a coram nobis petition is within the discretion of the trial court. *Payne*, 493 S.W.3d at 484.

A petition for writ of error coram nobis must be pled with specificity. *Nunley v. State*, 552 S.W.3d 800, 829 (Tenn. 2018) (citations omitted). "'Judges anticipate that the petition itself embodies the best case the petitioner has for relief from the challenged judgment. Thus, the fate of the petitioner's case rests on the ability of the petitioner to demonstrate that the petition is entitled to the extraordinary relief that the writ provides.'" *Id.* at 826 (quoting *Harris v. State*, 301 S.W.3d 141, 150 (Tenn. 2010) (Koch, J., concurring in part)). The petition must describe with particularity the nature and substance of the newly discovered evidence and demonstrate that the evidence qualifies as newly discovered evidence. *Id.* at 816 (citation omitted). To be considered newly discovered evidence, "'the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible.'" *Id.* (quoting *Payne*, 493 S.W.3d at 484-85). "The statute presupposes that the newly discovered evidence would be admissible at trial." *Id.* (citing *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012)). The trial court must be "reasonably well satisfied" with the veracity of the newly discovered evidence. *State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007).

The petitioner also must "'demonstrate with particularity . . . why the newly discovered evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence; and . . . how the newly discovered evidence, had it been admitted at trial, may have resulted in a different judgment.'" *Payne*, 493 S.W.3d at 485 (quoting *Harris*, 301 S.W.3d at 144 (Koch, J., concurring in part)). "In considering a

coram nobis petition, the trial court determines 'whether the new evidence may have led to a different result,' or in other words, 'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different.'" *Nunley*, 552 S.W.3d at 816 (quoting *Vasques*, 221 S.W.3d at 527).

A coram nobis petition "may be dismissed on the face of the petition, without discovery, an evidentiary hearing, or notification to the opposing party." *Clardy*, 691 S.W.3d at 400 (citing *Nunley*, 552 S.W.3d at 825-26). Trial courts are not required to hold an evidentiary hearing prior to dismissing a coram nobis petition "if the petition 'fails to meet the necessary prerequisites for granting coram nobis relief." *Nunley*, 552 S.W.3d at 829 (quoting *Harris*, 301 S.W.3d at 153 (Koch, J., concurring in part)). A coram nobis evidentiary hearing is required only when a hearing is "essential." *Clardy*, 691 S.W.3d at 401 (citing *Nunley*, 552 S.W.3d at 826).

We conclude that Defendant failed to establish that the admission of the evidence of the 1997 incident and the evidence of Chief Henderson's misappropriation of funds at trial may have resulted in a different judgment. The State argues that the evidence would have only served as impeachment evidence and, therefore, does not warrant coram nobis relief. In *State v. Vasques*, our supreme court stated that

> it is our further view that whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling. *Cf. State v. Sheffield*, 676 S.W.2d 542, 549 (Tenn. 1984); *State v. Arnold*, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). Impeachment evidence might be particularly compelling under the circumstances of a particular case. Moreover, a complete restriction on the availability of coram nobis relief in the case of any newly discovered impeachment evidence would be inconsistent with the discretion afforded to our trial courts. Finally, the language of Tennessee Code Annotated section 40-26-105 makes no distinction between impeachment evidence and all other evidence.

*Vasques*, 221 S.W.3d at 528.

Nevertheless, Defendant asserts that the evidence is both impeachment evidence and substantive evidence that was directly related to the defense theory of the case. He contends that the 1997 incident would have supported the defense theory that "(as before) [Chief] Henderson engaged in an improper high-speed pursuit in an unmarked vehicle, realized his mistake, and (as before) sought to cover it up by seeking false charges against a civilian in order to avoid scrutiny or even another lawsuit." Defendant further contends that evidence of Chief Henderson's illegal activities would have served as proof of his "authority over other members of the Sheriff's Department (and of his ability to suborn

them for his own purposes) as well as proof of a particular reason why he might want to avoid close scrutiny of his own conduct."

In determining whether newly discovered evidence may have led to a different result, the trial court must consider the evidence presented at trial and during the coram nobis proceeding. *Vasques*, 221 S.W.3d at 527. Defendant argues that the evidence from the hearing on the motion for new trial regarding Captain Amburn's reprimand also should be considered. Defendant relies on this court's holding in *Johnson v. State* that "when determining whether error coram nobis relief was warranted, the newly discovered evidence should be considered in light of the evidence introduced at the trial and the improperly withheld exculpatory evidence that this court previously determined should have been made available for use at the trial." *Johnson v. State*, 370 S.W.3d 694, 701 (Tenn. 2011). Although Defendant asserts that Captain Amburn's prior reprimand for failing to report the misconduct of another officers serves as proof of Captain Amburn's willingness to cover for Chief Henderson's alleged misconduct in the instant case, the trial court credited Captain Amburn's testimony during the coram nobis hearing that he did not engage in any "untoward" behavior during the events leading to Defendant's crash and the resulting investigation or that Chief Henderson instructed him to do so. Captain Amburn also testified that he was unaware that Chief Henderson was engaged in illegal activity or was under investigation at the time of Defendant's crash, and Captain Amburn stated that he testified truthfully at trial. The trial court found Captain Amburn's testimony at the coram nobis hearing to be credible, and "appellate courts do not reassess credibility determinations." *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009).

Even if the newly discovered evidence had resulted in the jury's disregarding all of Chief Henderson's testimony at trial, the remaining evidence overwhelmingly established that Defendant drove the vehicle in a reckless manner while intoxicated and crashed into a tree, resulting in the victim's death. Mr. Sumner testified regarding the alcohol consumed by Defendant prior to the crash, and Captain Amburn provided detailed testimony regarding the reckless manner in which the vehicle was being driven prior to the crash. Mr. Hickey affirmed that he saw the vehicle go by "really fast" prior to the crash. Following the crash, both Captain Amburn and Mr. Hickey saw Defendant struggling to exit the vehicle on the driver's side, and the victim was found lying on the ground by the passenger's side. According to Captain Amburn, Defendant's injuries were consistent with the damage to the driver's side of the vehicle. Defendant admitted to Mr. Sumner that he "ran from the police" and "gave them hell."

Following Defendant's release from the hospital, he told Mr. Sumner, "I really screwed up. I don't know why I did it, how it happened[.] . . . I made a mistake and I've got to live with this the rest of my life." Defendant told Captain Amburn that he had "really screwed up," that he wanted to apologize to the two officers from whom he had

fled, that he "didn't really sober up enough until around 1:30 in the morning to figure out what had happened," that "he knew he was going to jail for what he did," that he had "insisted" on driving, that "[y]ou and I both know I shouldn't have been driving," and that they "won't find any drugs, just alcohol" in his blood. Testing by both the hospital and the TBI of Defendant's blood sample taken by hospital personnel shortly after the crash established that Defendant had a blood alcohol level greater than the legal limit. Regardless of whether the newly discovered evidence served as impeachment evidence, substantive evidence, or both, Defendant has failed to establish that the admission of the newly discovered evidence at trial may have resulted in a different judgment. The trial court did not abuse its discretion in denying Defendant's coram nobis petition.

## K. Cumulative Error

Finally, Defendant seeks relief due to the cumulative effect of the errors in his trial. The cumulative error doctrine recognizes "that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010); *see State v. Leath*, 461 S.W.3d 73, 116 (Tenn. Crim. App. 2013). The only error that we have recognized in this appeal was the trial court's admission of all 1,500 pages of Defendant's medical records, but we have concluded that the error was harmless. Because Defendant has failed to establish that multiple errors were committed in the trial proceedings, he is not entitled to relief under the cumulative error doctrine.

## III. Conclusion

Upon reviewing the record, the parties' briefs and oral argument, and the applicable law, we affirm the judgments of the trial court.

s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE

- 71 -